GRAND RAPIDS ELECTRIC CO. *v.* WALSH MANUFACTUR-
ING CO.

1. PRINCIPAL AND AGENT — AUTHORITY OF AGENT — APPARENT
   POWERS—SECRET LIMITATIONS.
   A third person, having ascertained the general character and
   scope of an agency, is authorized to rely on the agent's having
   such powers as naturally and properly belong to such an
   agency, and, in the absence of circumstances putting him on
   inquiry, is not bound to inquire for secret qualifications or
   limitations of the agent's apparent powers.

2. CORPORATIONS—AUTHORITY OF AGENTS — QUESTION FOR JURY.
   Where a foreign corporation carried on an extensive business
   in a certain town, embracing a large heading mill and aux-
   iliary lumber camps, an opera house, and a general store,
   employing many men, all of which were under the general
   management of the corporation's local superintendent,
   whether he had apparent power to purchase a dynamo cost-
   ing over $600, necessary for the corporation's lighting plant,
   was for the jury.

3. NEW TRIAL—ABSENCE OF WITNESS—DILIGENCE.
   After a suit had been tried involving the authority of defend-
   ant's local superintendent, whose whereabouts were unknown
   to defendant at the time of the trial, defendant's president
   directed the letter to him in relation to the controversy, in
   care of the superintendent's father, to be by him addressed to
   his son, whose whereabouts were thereupon discovered.
   *Held,* that such facts did not show the exercise of sufficient
   diligence to require the granting of a new trial in order that
   the superintendent's testimony might be obtained.

Error to Crawford; Sharpe, J.   Submitted October 11,
1905.   (Docket No. 37.)   Decided November 21, 1905.

Assumpsit by the Grand Rapids Electric Company
against the Walsh Manufacturing Company for goods
sold and delivered. There was judgment for plaintiff,
and defendant brings error. Affirmed.

*James Donnelly*, for appellant.

*Stuart & Heald*, for appellee.

Blair, J. Plaintiff is a Michigan corporation, engaged in manufacturing and dealing in electrical supplies. Defendant is a Pennsylvania corporation, engaged in the manufacture of various kinds of cooperage stock, with branches of its business located in other States; one branch being located at Frederic, in Crawford county, in this State. The property at Frederic, consisting of a combined saw and heading mill, was purchased by defendant in May, 1903, and was soon thereafter remodeled and converted into a heading mill solely. Mr. J. C. Edsall was the superintendent of the old mill, and was retained by defendant as its superintendent till December 14, 1903, when he resigned and left its service. Defendant had a large plant at Frederic, containing an electric dynamo, which was in the plant when purchased, and was used to light it.

Some time prior to November 6, 1903, Edsall called upon plaintiff's superintendent at Grand Rapids, presented a business card of defendant company, upon which was printed, "Walsh Manufacturing Company, J. C. Edsall, Superintendent," and wanted to buy a 40 K. W. 250 volt generator. At Edsall's request, plaintiff's superintendent wrote to Crocker-Wheeler Company, of Ampere, N. J., to procure it, and communicated their reply to Edsall, addressing him as " J. C. Edsall, Supt. Walsh Manfg. Co., Frederic, Mich." Edsall had stated to plaintiff's superintendent that the dynamo was to be used to light the plant of the Walsh Manufacturing Company. On the 18th of November, 1903, Edsall wrote the following order for the dynamo:

"To *Grand Rapids Electric Company:*
" Ship to Walsh Manufacturing Company, Frederic, Michigan, J. C. Edsall, Superintendent. Ship freight at once, term reg. via M. C. R. R. *Please ship rush the Crocker-Wheeler dynamo 40 K-W 250 volt at price*

*quoted $515.00 with switch board at $102.00; also let me know if you can send me a good wire man for exposed work and also a line man.*

        *"Respectfully yours,*
            *"J. C. Edsall."*

The words italicized in the order were in writing; the remainder were printed. Mr. J. V. Walsh, president of the company, testified with reference to this letterhead as follows:

"Exhibit I is the form of letterhead used by our firm at Frederic. It was printed in Pittsburg, Pa.

"*Q.* And it was by the authority of your company that these words here, 'J. C. Edsall, Superintendent,' were printed upon there?

"*A.* Yes.

"*Q.* And your stationery for your correspondence and business there at Frederic were generally printed in that way, his name appearing as superintendent upon the letterheads, billheads and orderheads?

"*A.* Covering Frederic?

"*Q.* Yes, covering Frederic alone?

"*A.* Yes, sir; that is the case with all of our superintendents with all our mills.

"*Q.* Yes, sir; and your superintendents are required to use that stationery in conducting your business there?

"*A.* Yes, sir."

Upon receipt of this order, plaintiff at once telegraphed the factory to ship the machine as soon as possible. November 28th Edsall sent the following telegram:

        "FREDERIC, MICH., Nov. 28th, 1903.
"GRAND RAPIDS ELECTRIC COMPANY,
        "Grand Rapids, Mich.

"Change our order for dynamo from direct current to alternating current. See letter.

    [Signed] "WALSH MANUFACTURING COMPANY."

Plaintiff notified the factory, but received a reply that the machine had been shipped and order could not be canceled. Upon the arrival of the dynamo, the defendant refused to receive it, on the ground that Edsall had no authority to order it in its behalf, and caused it to be

shipped to plaintiff, who stored it subject to defendant's order, and brought this suit for the contract price.

The principal question in the case is whether there was any evidence which would warrant a finding that Edsall had sufficient authority to bind defendant by the contract which he undertook to make for it. Mr. Henry, the plaintiff's superintendent, testified:

" All I know of the authority of J. C. Edsall to act as agent for the Walsh Manufacturing Company in making this purchase was his own representations to me and the business card he presented. I made no further investigation."

It does not appear from the record that any such investigation was made by any one in plaintiff's behalf, or that it had any other knowledge of defendant's business or Edsall's connection therewith, except that gained from Edsall and the reports of the commercial agencies. It is conceded that Edsall had no express authority to make this particular purchase, and the evidence fairly negatives such authority as between himself and his company, but establishes that the company had expressly prohibited the making of such a contract. This prohibition was, however, known only to himself and the company. James E. Spencer, a witness for plaintiff, testified that he was a printer residing at Frederic; that President Walsh told him that Edsall was superintendent and general manager of the company.

" My dealings with the company were through Mr. Edsall. I did service for them, and rendered bill therefor and received pay. Transacted that business with Mr. Edsall. Mr. Edsall severed his connections with the Walsh Manufacturing Company as superintendent some time in December, 1903; the latter part of that month. Up to that time, he acted in the capacity of superintendent and general manager.

" Mr. Edsall, as superintendent of the Walsh Manufacturing Company, hired and discharged men. Some of the men were working in the mill and some in the camps and store; and he also was overseer of the business—the

mercantile business, timber business, and mill business. They established a general store there. He looked after that, and he hired and discharged men that worked around their business at Frederic.   *   *   *

"The work I did for the Walsh Manufacturing Company at Frederic was printing—job printing and advertising. This was done for the Frederic branch of the Walsh Manufacturing Company. The printing was billheads, letterheads, and cards. I haven't any of them here. I always made my bills out in the name of the Walsh Manufacturing Company, and most generally gave them to Mr. Edsall himself, and I got paid.   *   *   *

"Mr. Edsall himself paid for printing similar to those exhibits. I generally rendered my bills to Mr. Edsall, and he paid me himself. I was paid in currency at the mill office or store. At the mill they employed forty or fifty hands; at the store about a dozen at one time. I don't know how many they employed in the woods. They cut some of the logs out themselves. I know of their having only one camp. The six papers fastened together marked 'Exhibit Six' were printed in my office, at the request of J. C. Edsall, for the Walsh Manufacturing Company, and were paid for by the Walsh Manufacturing Company. [Offered in evidence.] I know what some of those were used for. What are called the stock reports and the blanks for orders to be filled out for labor, etc., were used in connection with the mills and camps.

"*Mr. Donnelly:* Do you know anything about the superintendent? Do you know whether it is identical with the Walsh Manufacturing Company or another superintendent?

"*A.* It is managed by the same man. I couldn't answer as to who owns it. I got my pay immediately upon presenting my bill, in cash."

President Walsh testified:

"We had a dynamo in our mill at Frederic at or about the time that this purchase was made.

"*Q.* State whether or not that dynamo answered the purpose of that mill?

"*A.* It did. During the time Mr. Edsall was superintendent, looking after our business, myself or some other member of the company, for the purpose of looking after our business, would go to Frederic every three or four weeks.   *   *   *

"We have a general superintendent of our Michigan business. Our Michigan business is in Marion and Frederic, Mich. We had another superior overseer at that time over all these various business locations. He wasn't over there very much; about thirty or forty days of Mr. Edsall's time. Latterly he left for other points. While Mr. Edsall was in charge of our business, he sold nothing, only what he knew of his actions—what had been previously authorized. He sold no timber or products of lumber from our mill at any time, except we knew of it, or had previously authorized it. We send money by express to Frederic to meet these reports. Mr. Edsall was paid by the month, and received vouchers for his salary separate from the rest, according to our agreement with him. * * *

"His capacity is to operate the mill, hire and discharge men. If there is a matter of importance comes up, it goes to the management or the general superintendent. R. B. Sayers is our general superintendent. He had full charge of the operations of all mills. The Walsh Manufacturing Company has direct management of the business all over the country. Then we have a general superintendent, who had charge of certain branches of our business in the West. We have other men in the East in similar capacity. One who has our East business has charge of our stave mills, and another in the West. Under these general superintendents come the superintendent in each of the particular branches. The first then in authority would be the Walsh Manufacturing Company, then next, the general superintendent, then Mr. Edsall, superintendent of the Frederic or particular branch."

Defendant's counsel contends that a party dealing with an agent is bound to inquire into the extent of his authority, ignorance of which is no excuse. This is undoubtedly a correct statement of a general principle of the law of agency, but this rule is not to be applied without qualifications and under all circumstances. It is equally well settled that, having ascertained the general character or scope of the agency, the party is authorized to rely upon the agent's having such powers as naturally and properly belong to such character, and, in the absence of circumstances putting him upon inquiry, is not bound to inquire for secret qualifications or limitations of the ap-

parent powers of the agent. *Inglish* v. *Ayer*, 79 Mich. 516; *Allis* v. *Voigt*, 90 Mich. 125; *Austrian & Co.* v. *Springer*, 94 Mich. 343. The legitimate powers of a general agent, in the absence of known limitations, must depend largely upon the circumstances of each particular case, and usually present questions of fact for the determination of a jury. The apparent right of the superintendent and general manager of a small business to make a purchase of machinery costing over $600 might be quite different from the right of the superintendent of a large business to make the same expenditure. The defendant company was a foreign corporation, carrying on, through Edsall as its local representative, extensive business enterprises at Frederic, consisting of a large heading mill and auxiliary lumber camps, an opera house, and a general store, employing many men, of all of which, as we understand the record, Edsall was the superintendent and general manager. We do not think it can be said, as a matter of law, that the purchase of the dynamo which was necessary for the lighting of the plant was so clearly outside of the apparent powers with which defendant had clothed Edsall as to justify the court in directing a verdict for defendant. We therefore think that the court committed no error in submitting the question to the jury.

Error is also assigned upon the refusal of the court to grant defendant's motion for a new trial, which is properly before us for review. The only point presented by the motion, not already disposed of by this opinion, which we deem worthy of consideration, is the fourteenth ground of the motion:

"Because the whereabouts of J. C. Edsall has been ascertained, and it is believed that he can be secured as a witness on a retrial of said cause, or his deposition taken for use on such a retrial."

We do not think there was a sufficient showing of diligence in endeavoring to procure the attendance of Edsall to require the trial judge to grant the motion on this ground. *Canfield* v. *City of Jackson*, 112 Mich. 120.

In that case the facts, which are not set forth in the report cited, were substantially, as stated by the trial judge, as follows:

" That at the trial it first appeared that, when plaintiff fell upon the sidewalk, a one-armed man, who was driving along the street, came to her assistance, but that this man could not be found; his name could not be ascertained. He was not produced on the trial by either party. That after the trial, and on February 9th, the defendant's attorney published a notice in the Jackson daily papers, asking said party, whoever he might be, to call upon the mayor or chief of police of the defendant or its attorneys, and that, as a result of such publication, the Joseph T. Butler, whose affidavit is made the basis of this action, called upon defendant's attorney February 13, 1896, and made such affidavit. Mr. Butler's testimony would go to the two principal questions, whether there was a hole in the sidewalk, and it was thereby rendered out of repair, as claimed by plaintiff, and whether the plaintiff was actually injured by falling at said hole. Probably, his testimony would also dispute, and so weaken, to a greater or less extent, the testimony of plaintiff and her witnesses to these two propositions, and that both of these principal questions were of the very substance of the issue as made on the pleadings; and this must have been apparent to the defendant as soon as the declaration was served, which appears, by the return of the sheriff, to have been August 2, 1894. The duty of the parties in preparing for the trial thereof attached with the declaration so served, and it became the defendant's legal duty to exercise diligence from that time to prepare for the trial upon these two questions. In my judgment, it cannot be said that the defendant has performed that duty under the circumstances of the case as above stated; and to illustrate the truth of this, it may be observed that, if the same course which was pursued had been resorted to earlier in the history of this case, it is not unreasonable to suppose that Mr. Butler could have been discovered and produced upon the trial."

In the case at bar the showing made by President Walsh on October 18, 1904, is that the case was tried on the 19th and 20th of September, 1904, and that—

" On or about October 1, 1904, he wrote a letter to J.

C. Edsall, from Pittsburg, Pa., in relation to his action in the purchase of a dynamo from the above-named plaintiff, which dynamo is the subject of the above suit, and sent the letter to L. C. Williams, Frederic, Michigan, and requested him to take the letter to the father of J. C. Edsall, who resides at Frederic, Michigan, and have the father of J. C. Edsall address and send the letter to his son, J. C. Edsall, whose whereabouts at that time were unknown to deponent; and that deponent received a reply to his said letter from said J. C. Edsall, dated at Groveton, Texas, on the 9th inst." etc.

We have examined the other assignments of error not covered hereinbefore, and find them without sufficient merit to require further discussion.

The judgment is affirmed.

MOORE, C. J., and McALVAY, GRANT, MONTGOMERY, and OSTRANDER, JJ., concurred.