## SWIFT & CO. v. DETROIT ROCK SALT CO.

### (Circuit Court of Appeals, Sixth Circuit.   June 16, 1916.)

### No. 2792.

1. CONTRACTS ⚌248—ACTIONS FOR BREACH—EVIDENCE—SUFFICIENCY.

In an action for breach of contract with defendant's predecessor, the question whether defendant had adopted the contract *held* for the jury.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1140; Dec. Dig. ⚌248.]

2. CONTRACTS ⚌240—ASSUMPTION—MODE.

For a stranger to assume a contract, it is not necessary that he should do so expressly; it being sufficient if he conducts himself so as to lead others to believe that he intended to make the contract his own.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1125; Dec. Dig. ⚌240.]

3. PRINCIPAL AND AGENT ⚌171(1)—RATIFICATION—EQUITABLE ESTOPPEL.

Where defendant apparently recognized a contract made by its predecessor, making deliveries and accepting substantial benefits thereunder, it is thereafter estopped from questioning the authority of the agent who apparently recognized the contract.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 644, 645, 653, 654; Dec. Dig. ⚌171(1).]

4. PRINCIPAL AND AGENT ⚌119(1)—AUTHORITY OF AGENT—PRESUMPTION.

Parties dealing with an agent have the right to presume that his agency is general, and that he is acting within the scope of his authority, and, as regards third persons, the authority of the agent depends, not on the instructions given, but upon the character of the authority bestowed.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 391, 393, 398, 399, 401; Dec. Dig. ⚌119(1).]

5. CORPORATIONS ⚌425(4)—AGENTS—AUTHORITY OF.

When one deals with a corporation without knowledge of any irregularity on the part of the corporation's agents, the corporation cannot deny the authority of its agents to make contracts apparently within the scope of their authority, where such contracts are not ultra vires.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1700, 1701; Dec. Dig. ⚌425(4).]

In Error to the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Action by Swift & Co. against the Detroit Rock Salt Company. There was a judgment for defendant, and plaintiff brings error. Reversed and remanded.

T. G. Long, of Detroit, Mich., for plaintiff in error.

P. B. Moody, of Detroit, Mich., for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and SESSIONS, District Judge.

SESSIONS, District Judge.   In March, 1911, the Detroit Salt Company, a Michigan corporation, was engaged in mining, manufacturing and selling salt. Its plant was located near Detroit. On March 24, 1911, the Detroit Salt Company and the plaintiff, Swift & Co., entered into a written agreement whereby the former agreed to sell to

⚌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the latter all of the rock salt used by it in a specified territory for a term of five years from January 1, 1912, at the price of $2.25 per ton in bulk f. o. b. the Salt Company's mine. The contract also gave to plaintiff an option to purchase at the same price the salt used in its plants at East St. Louis and South St. Paul after the termination of an existing contract which expired October 31, 1912. Four days later, March 28, 1911, in a foreclosure suit in the circuit court for the county of Wayne, the Security Trust Company of Detroit was appointed receiver for the Salt Company. The order appointing the receiver authorized and directed it "to continue the business of said defendant company without interruption and to fulfill its contracts (other than the payment of indebtedness of said company)." Immediately after its appointment the receiver notified plaintiff "that all existing contracts for the delivery of salt will be carried out by the receiver, who has been authorized so to do by the court." August 1, 1912, Warren W. Clute succeeded the Security Trust Company as receiver. The receivership was terminated September 30, 1912, when the defendant, Detroit Rock Salt Company, was organized by the stockholders, bondholders and other creditors of the old company and took over the latter's property and business. Mr. Clute, the receiver, became president of the new corporation. During the receivership all orders for salt were given by the plaintiff and filled by the receiver in accordance with the terms of the contract. After the receiver was discharged and until the end of the year 1912 salt was furnished to the plaintiff by the defendant upon orders (75 in number), referring directly to the contract and at the price and upon the terms therein named. Defendant's letter heads, invoices and other stationery were all stamped or printed: "Detroit Rock Salt Co., Successors to Detroit Salt Co."

One Edward E. Rude had charge of the salt sales under the receiver and after the organization of the defendant corporation continued in sole charge of its Detroit office for about nine weeks. During that time no officer of the company was in the office and no instructions were given to him. He attended to all correspondence and made or supervised all sales of salt. On October 8, 1912, while Rude was in charge of the office, plaintiff sent a letter of inquiry, addressed to the Detroit Salt Company, asking for prices for salt delivered at South St. Paul for a period of one year after November 1, 1912, when its former contract expired, and in reply received a letter dated October 9, 1912, signed "Detroit Rock Salt Company, per Rude," and containing the statement:

"Your kind favor of the 8th inst. to hand * * * inquiring for price on your rock salt requirements for South St. Paul, Minn., commencing November 1st. In reply, you will find the above proposition covered in contract, entered into March 24, 1911. Reference to this document will undoubtedly give you the information required."

On October 12, 1912, plaintiff again wrote to defendant:

"Referring to your letter regarding rock salt requirements for South St. Paul, you understand that our five-year contract with you gives us the option of including our St. Paul and East St. Louis requirements. The chances are good we will be able to buy rock salt delivered at South St. Paul and East

St. Louis at figures less than those in the contract in question. Therefore we thought you would prefer to make a special price at South St. Paul now and another for East St. Louis a little later."

In reply plaintiff received the following letter, dated October 19, 1912:

"Replying to your kind favor of the 12th inst. we hardly think it would be just the thing for you to do, to place your South St. Paul and St. Louis business elsewhere. We naturally prefer that our mine be your full source of supply. We also take advantage of this opportunity to suggest that in our opinion you will certainly experience some difficulty in securing any better price than represented in our contract, which will mean, $4.05 St. Louis or $4.55 St. Paul, based on present freight rates."

From November 1 to December 31, 1912, plaintiff's orders for salt for South St. Paul delivery were filled at the contract price which was a reduction of 25 cents per ton from the price named in and paid under the former contract. On December 5, 1912, there was a change of management of the defendant company and after December 31, 1912, defendant refused to fill plaintiff's orders except at an increased price of 50 cents per ton, which plaintiff has been compelled to pay. This suit is brought to recover damages for the alleged breach of the contract of March 24, 1911. At the close of the proofs the trial judge directed a verdict in favor of defendant mainly upon the ground that there was no evidence to warrant a finding that Rude was authorized to act for the defendant or that the defendant had adopted the contract made with its predecessor, the Detroit Salt Company.

[1-5] If the case had been submitted to the jury, would the evidence, with all legitimate inferences which might have been drawn therefrom, have warranted and supported a finding that the defendant had so far adopted the contract made with its predecessor, the Detroit Salt Company, as to bind itself to the performance thereof by the sale and delivery of salt at the price, in the quantity, for the term and upon the conditions therein set forth? As said by the Supreme Court in Wiggins Ferry Co. v. O. & M. Railway Co., 142 U. S. 396, 408, 12 Sup. Ct. 188, 192 (35 L. Ed. 1055); and adopted and followed by this court in E. E. Taenzer & Co. v. Chicago, R. I. & P. Co., 170 Fed. 240, 245, 95 C. C. A. 436, 441:

"It is not necessary that a party should deliberately agree to be bound by the terms of a contract to which he is a stranger, if, having knowledge of such contract, he deliberately enters into relations with one of the parties, which are only consistent with the adoption of such contract. If a person conduct himself in such manner as to lead the other party to believe that he has made a contract his own, and his acts are only explicable upon that theory, he will not be permitted afterwards to repudiate any of its obligations."

The evidence fairly shows that the receiver of the Detroit Salt Company was authorized to and did perform the contract in accordance with its terms during the receivership. After the receiver was discharged, the defendant, instead of repudiating and refusing to be bound by the agreement, to all appearances expressly recognized the contract and continued to perform it for a period of more than two months and, during that time, accepted and retained substantial bene-

fits arising therefrom. The reasonable and probable result of such conduct was to lead plaintiff to believe that defendant had adopted and would carry out the agreement in its entirety and thus to prevent plaintiff from contracting for its salt elsewhere before the rise in price. In Bronson's Executor v. Chappell, 12 Wall. 681, 683, 20 L. Ed. 436, the Supreme Court said:

"Where one, without objection, suffers another to do acts which proceed upon the ground of authority from him, or by his conduct adopts and sanctions such acts after they are done, he will be bound, although no previous authority exist, in all respects as if the requisite power had been given in the most formal manner. If he has justified the belief of a third party that the person assuming to be his agent was authorized to do what was done, it is no answer for him to say that no authority had been given, or that it did not reach so far, and that the third party had acted upon a mistaken conclusion. He is estopped to take refuge in such a defense. If a loss is to be borne, the author of the error must bear it."

The receiver under whose directions the contract had been partially performed became the president of the new corporation. The sales agent of the receiver was continued in the same position and was given sole charge of defendant's principal business office. The testimony tends strongly to show that both had full knowledge of the contract with plaintiff and their knowledge is attributable to defendant. Aside from the natural inference arising from the magnitude, character, history, customs and methods of conduct of the business carried on by the Detroit Salt Company, its receiver and its successor, there is some evidence that term contracts for the sale of salt are usual and even necessary in that industry. It is conceded that the agent in charge of its sales department had authority to make current sales of salt for immediate delivery, but the insistence is that his powers were strictly limited to such sales and that his acts in making or adopting sales contracts covering a term of years were outside of the scope of his authority and not binding upon the defendant. The record does not show that any express limitations or restrictions were placed upon the powers of its agent by its officers and directors. Certainly plaintiff had neither knowledge nor notice of any such restrictions or limitations. Rude was the agent of defendant and was given charge of its office and correspondence for the express purpose of selling its salt. The rule is settled that, in the absence of notice otherwise, "parties dealing with an agent have a right to presume that his agency is general, and not limited * * * and the presumption is that one known to be an agent is acting within the scope of his authority," and also "that the authority of the agent must depend, so far as it involves the rights of innocent third persons who have relied thereon, upon the character bestowed, rather than the instructions given." Austrian & Co. v. Springer, 94 Mich. 343, 54 N. W. 50, 34 Am. St. Rep. 350; Inglish v. Ayer, 79 Mich. 516, 44 N. W. 942; Grand Rapids Electric Co. v. Walsh Mfg. Co., 142 Mich. 4, 9, 105 N. W. 1; Lamon v. Speer Hardware Co. (C. C. A. 8), 198 Fed. 453, 457, 119 C. C. A. 1. In Merchants' Bank v. State Bank, 10 Wall. 604, 644, 19 L. Ed. 1008, the Supreme Court thus applied this rule to corporations:

"Where a party deals with a corporation in good faith—the transaction is not ultra vires—and he is unaware of any defect of authority or other irregu-

larity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect or irregularity, the corporation is bound by the contract, although such defect or irregularity in fact exists. If the contract can be valid under any circumstances, an innocent party in such a case has a right to presume their existence, and the corporation is estopped to deny them. The jury should have been instructed to apply this rule to the evidence before them."

The question of whether the defendant had adopted the contract between plaintiff and the Detroit Salt Company and hence was liable for its breach thereof should have at least been submitted to the jury under proper instructions and it was error to direct a verdict in its favor. Inasmuch as the evidence upon a new trial may not be the same, we find it unnecessary to decide whether upon the evidence presented at the former trial a direction of verdict in plaintiff's favor would have been proper.

The judgment of the lower court is reversed and a new trial granted.