## DETROIT, T. & I. R. CO. v. DETROIT & T. S. L. R. CO.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1925.)

No. 4097.

1. **Estoppel** ⊝90(1)—**Complainant held estopped by long acquiescence in claimed cancellation of lease.**

The decree in a foreclosure suit against a railroad provided that the purchaser might disavow any lease or contract affecting the property within 90 days after confirmation of the sale; otherwise, all such contracts of which the purchaser had notice, after inquiry of the receiver, should be deemed adopted. The mortgagor had itself purchased the property at foreclosure sale, and its predecessor in title, after execution of the mortgage foreclosed in that suit, had made a contract granting complainant company trackage rights for a term of years. After the last sale the purchasing committee of bondholders, which assigned its bid to defendant company, organized for the purpose, and its counsel, were told by the receiver that the trackage contract had been canceled by the receiver in the former suit, and that complainant had since been using the track involved on sufferance, under the terms of the old lease, pending a new arrangement, in which situation complainant had apparently acquiesced for years, and continued to acquiesce by entering into negotiations with defendant for a new contract without making any claim that the original lease was still in force, until after the 90 days for disavowal had expired. *Held,* that it was estopped to then assert such claim.

2. **Railroads** ⊝138—**Trackage agreement held personal, and not to run with land.**

A contract between two railroad companies, by which one grants to the other the right to use certain trackage, does not run with the land, but is merely personal between the parties, and not binding on the successor of one through foreclosure proceedings, unless adopted by it.

3. **Estoppel** ⊝95 — **Silence with knowledge that the other party was misled to his prejudice held to create estoppel.**

A party may be estopped by silence when it was his duty to speak, as where, in negotiating a contract, he has knowledge that the other party is acting in the mistaken belief that a prior contract, which he has the absolute right

to disavow within a certain time, had been canceled, and keeps silence until such time has passed, and then seeks to enforce the old contract.

**4. Corporations ⊚═425(5)—Estoppel by representation of corporate officers may arise, though based on mistake of law.**

Representation by officers of one corporation, expressly or by implication, that it concedes the claim of another corporation that a contract between them has been terminated, and prejudicial reliance on such representation, may create an equitable estoppel, though it was based on a mistake of law.

**5. Estoppel ⊚═95—When silence creates estoppel stated.**

The rule that silence will not create an estoppel where the facts are equally available to both parties is not applicable to a case where the apparent agreement of one party, with a claim made by the other, prevents the latter from making investigation.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in equity by the Detroit & Toledo Shore Line Railroad Company against the Detroit, Toledo & Ironton Railroad Company. Decree for complainant, and defendant appeals. Reversed and remanded, with directions.

For opinion below, see 290 F. 549.

Wm. Lucking and Alfred Lucking, both of Detroit, Mich. (Clifford B. Longley and Laurence M. Sprague, both of Detroit, Mich., on the brief), for appellant.

Harold R. Martin, of Detroit, Mich., and H. W. Morgan, of Toledo, Ohio (Chas. A. Schmettau, of Toledo, Ohio, and Harrison Geer, of Detroit, Mich., on the brief), for appellee.

Before DENISON, DONAHUE, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This is an appeal from a decree requiring specific performance by defendant for the unexpired portion of the term of a 99-year contract, effective July 1, 1903, between plaintiff and the defendant's remote predecessor in ownership (the Detroit Southern Railroad Company), for the joint use of certain railroad track mileage now owned by defendant, together with appurtenant facilities.

When the contract was made plaintiff was operating, and still operates, a line of railroad from Detroit, Mich., to Toledo, Ohio. The Detroit Southern Railroad Company was then operating a line of railroad from Detroit, Mich., to Ironton, Ohio. The trackage in question (now owned by defendant)

extends for a distance of about 11 miles from a point at or near Trenton, Mich., through which place each road passed, to the then village of Delray, Mich., an industrial district in the then outskirts of the city of Detroit, and now part of that city.[1] In 1905 the entire line of railroad of the Detroit Southern Railroad Company was sold to Otto F. Bannard, under an equity decree of foreclosure of a railroad mortgage given by the Detroit Southern Railroad Company in 1901 (thus antedating the contract in question), covering the Detroit Southern's entire line of railroad, and so including the tracks involved in the trackage contract, and containing the further blanket description quoted in the margin hereof.[2]

Immediately following the confirmation of the 1905 sale, the commissioner conveyed to Bannard the railroad property described in the mortgage. On the same date Bannard conveyed the entire property to the Detroit, Toledo & Ironton *Railway* Company, and at the same time the Detroit Southern, and the receiver of its property appointed by the court in the consolidated foreclosure and creditors' suits against the Detroit Southern, conveyed to the Detroit, Toledo & Ironton *Railway* Company, as assignee of purchaser Bannard, and to that company's successors and assigns, by virtue of the direction contained in the decree of foreclosure and sale, the railroad property as described in the mortgage and in the commissioner's deed, all of which conveyances were received and accepted by the Detroit, Toledo & Ironton *Railway* Company. Throughout the receivership over the Detroit Southern, created in the creditors' suits in 1904, and continued

---

[1] By the 1903 contract plaintiff was to pay a rental of $6,000 per year, in monthly installments, plus 2 per cent. on cost of necessary changes, betterments, and improvements, and a portion—reckoned on car-mileage basis—of the cost of repairing, maintaining, improving, and keeping up the property in question.

[2] "All such real and personal property as may be germane to, or necessary for, the construction, operation, and maintenance of said several lines of railroad, whether now owned and possessed by said railroad company or hereafter to be acquired by it, * * * and also all rights, powers, privileges, and franchises of, or belonging to, or hereafter to be acquired by, the railroad company, * * * together with all the appurtenances in anywise thereunto belonging, or which it may acquire for use in connection with said several described railroads, and the tolls, income, rents, issues, and profits thereof, and other property now held or hereafter acquired by said railroad company in connection therewith, and all rights, franchises, and privileges pertaining thereto."

over the mortgaged property during the fore-closure proceeding, the receiver—with the qualification hereinafter stated—continued to carry out the 1903 contract in connection with his operation of the Detroit Southern, receiving and accepting the rental income thereunder throughout the receivership.

On June 28, 1913, the railroad property in question was sold to Bannard and Buchner, under decree in consolidated causes of foreclosure of two separate trust mortgages given by the Detroit, Toledo & Ironton *Railway* Company on May 2, 1905, immediately upon the above-mentioned conveyance to it of the Detroit Southern Railroad property, and described in the mortgages substantially as in the Detroit Southern mortgage before mentioned.[3] This sale to Bannard and Buchner was made to them jointly, as a purchasing committee for certain bondholders under the foreclosed mortgages, and as part of a plan of reorganization of the railroad by such bondholders and their associates, which included the organization of the present corporation, the Detroit, Toledo & Ironton *Railroad* Company, which it was intended should acquire title to the property so sold and thereafter operate the railroad.

On October 20, 1913, the commissioner's report of sale (filed July 26, 1913) was confirmed, and on March 2, 1914, pursuant to the decree of foreclosure and sale, conveyance was made to the Detroit, Toledo & Ironton *Railroad* Company (the present defendant) by the master commissioner, the Detroit, Toledo & Ironton *Railway* Company, the then receiver over the last-named company's property in the foreclosure suit, Bannard and Buchner (the purchasers at mortgage sale), and the New York Trust Company, as mortgage trustee—said conveyance covering all the property described in the Detroit, Toledo & Ironton *Railway* Company's mortgages. There was also an omnibus description substantially as in the conveyances to the Detroit, Toledo & Ironton *Railway* Company. The trackage agreement was not in terms mentioned.

From the time of the Detroit, Toledo & Ironton *Railway's* purchase in 1905 until the 1908 receivership, plaintiff continued to operate its trains in accordance with the contract of 1903, and to pay the agreed rental to the Detroit, Toledo & Ironton *Railway* Company, which, during that period, carried out the trackage contract. The same course

had been pursued as between plaintiff and the receiver during the pendency of the creditor's foreclosure suits in 1904–05, and under the 1908 receivership, which continued until the conveyance by Bannard and Buchner to defendant March 2, 1914, the rentals were paid by plaintiff to and received by the receivers. At present it is enough to say that, after a date in 1909, plaintiff was merely allowed by the receivers to continue until further notice upon the terms provided in the 1903 contract.

The conveyance of March 2, 1914, to the detroit, Toledo & Ironton *Railroad* Company, was by its terms declared "subject, however, to each and all the terms, provisions, and conditions" of the decree of 1913. The 11th article of that decree provided for disavowal by the purchaser of contracts or leases or rights thereunder constituting part of the property sold thereunder, as printed in full in the margin hereof.[4] Neither the purchasers, Bannard and Buchner, nor the present defendant, filed within 90 days after confirmation of the sale, nor afterwards, so far as shown by the record, any formal instrument of disavowal.

Soon after receiving conveyance of the railroad property, defendant submitted to plaintiff a draft of a new contract, in terms superseding and canceling the contract be-

---

[3] The second amended decree was filed May 31, 1913.

[4] "The purchaser or purchasers, or his or their successor or successors or assigns, may within 90 days after the confirmation of the sale of the property disavow, renounce, and relinquish any contract or lease, or the rights thereunder, which are part of the property to be sold; such disavowal or disavowals shall be made by instrument in writing and signed and verified by the said purchaser or purchasers, or their successor or successors or assigns, and shall contain a general description of the contracts or leases which he or they shall disavow, renounce, and relinquish, and shall be filed with the clerk of this court within the aforesaid period of 90 days. No conduct or user of rights by such purchaser, within such period of 90 days, unaccompanied by the filing of such written instrument, shall be deemed to conclude the purchaser in respect of such disavowal. Upon the filing of such disavowal or disavowals, the said purchaser or purchasers, or their successor or successors or assigns, shall be deemed not to have purchased the said contracts or rights thereunder therein described, or to be bound by the obligations of said contracts or leases: Provided, however, that such disavowal or disavowals shall not entitle the said purchaser or purchasers, their successor or successors or assigns, to any reduction in the amount of a bid, or in any amount to be paid as in this decree provided. Unless disclaimed in the manner and within the time above provided, contracts and leases of which the purchaser has notice after inquiry made of the receiver, shall be deemed adopted by him."

tween plaintiff and the Detroit Southern. After some correspondence, and on April 21, 1914, defendant notified plaintiff that the proposed contract would be put into effect May 1, 1914, and 3 days later defendant was notified by plaintiff that it claimed the contract of July 1, 1903, to be still in full force and effect. Defendant thereupon threatening to exclude plaintiff from further use of the tracks, this suit was begun.

[1] The master commissioner to whom the case was referred was of opinion that plaintiff was disentitled to relief, for the reason, among others, that plaintiff was estopped by its conduct from claiming that either defendant or the purchasers at the sale of June 28, 1913, had such notice of the trackage contract of 1903 (presumably meaning its continued existence) · that its failure to file formal disavowal within the 90-day period prevented it from thereafter disclaiming liability under the contract. The District Judge overruled the master's report in this and other respects, and rendered decree for plaintiff. 290 F. 549.

Plaintiff contends that · the contract was adopted by the Detroit, Toledo & Ironton *Railway* Company, as assignee of the Detroit Southern, as purchaser under the 1905 foreclosure sale of after-acquired property, and by virtue of actual assumption of benefits and burdens. See Wiggins Ferry Co. v. O. & M. Ry. Co., 142 U. S. 396, 407, 408, 12 S. Ct. 188, 35 L. Ed. 1055; Taenzer v. C., R. I. & P. R. R. Co. (C. C. A. 6) 170 F. 240, 244, 245, 95 C. C. A. 436. Defendant disputes these contentions, and also insists that the contract did not pass to it under the foreclosure sale of the Detroit, Toledo & Ironton *Railway* Company mortgages, and so was not subject to the disavowal provision of the decree.

For the purposes of this opinion, we shall assume (without so deciding) that the original property right of the Detroit Southern in the trackage agreement was covered by the decree of foreclosure of the Detroit, Toledo & Ironton *Railway* Company's mortgages, and was normally subject to the disavowal provision. But in view of the history of the dealings between plaintiff and defendant, and those representing the latter, as hereinafter set forth, it seems clear that defendant is not bound, either legally or equitably, by the contract of 1903, unless solely by reason of failure seasonably to file formal notice of disavowal.

[2] The 1903 contract did not run with the land nor create any lien upon it. It was merely personal as between the original contractors—the plaintiff and the Detroit Southern—unless and until adopted by the successor or successors of the latter company. Des Moines R. R. Co. v. Wabash R. R. Co., 135 U. S. 576, 10 S. Ct. 753, 34 L. Ed. 243; Baker v. Central Trust Co. (C. C. A. 6) 235 F. 17, 25, 148 C. C. A. 511. Upon a careful examination of the record, we think plaintiff estopped from asserting failure to make and file such formal disavowal.

We are satisfied that neither the purchasers (Bannard and Buchner) nor those representing them and the bondholders (including the legal counsel of the bondholders' committee, the counsel for the purchasing committee, Mr. Johnson, the last receiver, and Mr. Kurn, president of the defendant company) knew or had notice within 90 days after confirmation on· October 20, 1913, of the report of sale, nor previous to April 24, 1914, that the 1903 contract was still in force (or that plaintiff so claimed), and that their understanding was to the contrary, and that so far as any of them had information of its prior existence such information was coupled with the apparently credible information that it had been canceled.[5]

We also think the evidence preponderates in favor of the conclusion that during the last several months of the final receivership, and during at least the first 7 weeks of de-

---

[5] On March 13, 1913, Receiver Johnson wrote Mr. Bannard and ·Mr. Poor (who was counsel for one of the committees), saying: "In view of the early termination of the receivership, we deem it expedient to call your attention to conditions existing between the Detroit, Toledo & Ironton Railway and the Detroit & Toledo Shore Line Railway, whereby the Detroit & Toledo Shore Line Railway enjoys trackage right privileges over 11 miles of our railroad, this privilege having been granted them by the contract of 1903 for a period of 99 years, entered into by the presidents of the respective companies, at that time. *This contract, however, was canceled by the former receivers of the D., T. & I. Ry., and was acknowledged as canceled by the general manager of the D. & T. S. L. Ry.,* for the reason that conditions were so changed that the contract as was in existence of 1903 was not fair to the D., T. & I. Ry., from the fact, as is shown by attached statement, that the D. & T. S. L. Ry. had more than doubled their business, for which the D., T. & I. Ry. did not derive any benefit, excepting the increased proportion of the maintenance and operation. In view of this fact, I am inclosing copy of the original contract and proposed contract to be entered into between the D., T. & I. Ry. and the D. & T. S. L. Ry.," etc. There followed a more detailed discussion of the trackage situation. All italics in this opinion are ours.

fendant's ownership and operation of the road, and thus during the entire disavowal period—if reckoned from date of confirmation of sale—plaintiff understood, not only that the receivers had abrogated the contract, so far as they were concerned, and that plaintiff's operation thereunder was merely by sufferance and liable to be terminated at any time, but also continuously from a time preceding the foreclosure sale understood that the representatives of the D., T. & I. bondholders, as well as defendant (after its organization) believed the 1903 contract was already at an end, and did not intend to accept or recognize it, and that plaintiff, by its conduct, apparently acquiesced in and assented to such belief and construction on the part of the representatives of the D., T. & I. bondholders and the defendant.[6]

On June 11, 1909, the receivers of the Detroit, Toledo & Ironton *Railway* Company, wrote Mr. Atwater, the assistant to and the personal representative at Detroit of the president of the Grand Trunk Railway Company,[7] calling attention to the subject of the occupancy of the tracks, and saying that the receivers would negotiate a contract for the plaintiff's further occupancy of the tracks, but did not desire to continue further the existing situation. This letter was written after instructions from then District Judge Swan that the receivers could cancel the contract. The letter stated that *formal notice of the abrogation of the contract with plaintiff was given at the time the Detroit, Toledo & Ironton Railway Company was organized.* The absence of proof of such earlier notice is not important, especially in view of plaintiff's treatment of the notice conveyed by the letter. The letter further said that, in order that plaintiff might not be embarrassed, and that opportunity might be had to meet and make any new arrangements which might be agreed up-

[6] The master, who saw and heard the witnesses, found as a fact that the purchasers did not, at any time after the entry of decree, nor within the 90-day period, have knowledge or notice that the contract of 1903 was in force and effect, nor that plaintiff claimed or believed that it was in such force and effect, but that, on the contrary, the purchasers had been informed by Receiver Johnson, had good reason to believe, and did believe during 1913, and up to the date of the conveyance to the defendant, that the contract was not in legal effect.

[7] Plaintiff railway company was owned in equal shares by the Clover Leaf and the Grand Trunk. Its executive committee was composed of a representative of each of those roads; the president was taken from one of them, the vice president from the other.

6 F.(2d)—54

on, the receivers would allow the then conditions to continue until midnight of July 31, 1909, when they should expect plaintiff to terminate the use of the tracks, unless in the meantime an arrangement satisfactory to the receivers should be perfected.

Mr. Atwater sent the letter to Mr. Main, then superintendent of plaintiff railroad. Mr. Fitzhugh, vice president of plaintiff company, in charge of operation and maintenance, a member of the executive committee and the authorized representative of the Grand Trunk in Shore Line matters, requested Receiver Lowell to permit plaintiff, "to continue the use of the line upon the same terms under which we have been using it until we could negotiate a new arrangement or make other arrangements for connecting up our line with the Grand Trunk." Mr. Fitzhugh testifies that "Mr. Lowell's reply was he had no desire to embarrass us; that he was willing to continue the arrangement, pending a new agreement," which was all Mr. Fitzhugh asked. On July 29, 1909, Mr. Lowell, general manager for the receivers, advised Mr. Main, then superintendent of plaintiff company that, in view of the fact that conference was to be held the following week between Receiver Warren, Main, and Lowell, regarding the 1903 contract, "no action will be taken in regard to the previous letter to Mr. Atwater until after the conference." From that time the matter drifted. Mr. Atwater says he knew, *at least from June, 1909,* down, that the *Detroit, Toledo & Ironton people claimed the contract had been canceled,* and that it was discussed informally among the Shore Line people and at the directors' meetings. Mr. Fitzhugh, vice president of plaintiff company from 1905 to 1911 or 1912, testified that he knew "the receiver had given notice of the cancellation of the contract," and that as vice president the witness knew that such notice had been served on some one connected with the Shore Line Railroad. Mr. Lowell further testified that "neither Mr. Fitzhugh nor Mr. Hayes denied the fact that the contract had been canceled by" the witness. Mr. Main, plaintiff's general manager, admitted that he had general information that the question of cancellation of the 1903 contract was "up" at the time the road changed hands in 1905, although previous to the receipt of the 1909 letter he did not know the receivers claimed it had been canceled; that in his conferences with the D., T. & I. (presumably, the series, parts of which are referred to herein), and before he had asked legal advice, when he

was "just whipping the thing into shape," he "assumed the old contract had been canceled, but we were operating under it."

As the time of foreclosure sale drew near, Receiver Johnson (who became such May 12, 1912, and continued until the conveyance to the present defendant) took up with plaintiff the question of a new contract, and on March 24, 1913, sent plaintiff copy of a proposed new 3-year agreement, upon a minimum revenue-earning basis of $12,000 per year, and a month later advised the president of the Clover Leaf and the vice president of the Grand Trunk thereof. That the proposed new contract was intended ultimately to be between plaintiff and the expected purchasers, and that Johnson in his negotiations represented the bondholders' interests, is plain, notwithstanding the fact that in the first draft the receiver was named as the lessor.[8]

Plaintiff took up consideration of the new contract. May 1st the receiver advised plaintiff's general manager: "We are particularly anxious to close the matter up during the receivership, and we don't feel that we can in any way change the wording of the old contract as it is now outlined in the new." Plaintiff's general manager replied: "It is a question in my mind whether a contract made with the receiver would be binding on the subsequent operators of the road, unless the court made it part of the condition of the sale. Will you please say as to this,

and also why the term of the contract is made for only 3 years? If we enter into a stiff and expensive contract at this time, it seems to me it should be for a long term of years, so that we will have a chance to get something out of it when the Rouge district gets more thickly built up, as we hope it will. The old contract *ran* for 99 years." The receiver replied that the reason for the 3-year feature is "that we cannot tell what is going to be done with the property, and, if it is bought by some other interests, it would hardly be fair for us, as receiver, to tie them up to a long-term contract." The receiver added: "You have now been operating over the Detroit, Toledo & Ironton Railway for 2½ years *without a contract*, and we think something definite should be done."

Plaintiff's manager, in the course of his reply, said: "As you say, it would hardly be fair for the receiver to tie up the property for a long contract, as you are expecting the line to be sold; it seems to me it would be a good deal better to let the negotiations go over until the new owners are in a position to take it up." It was also said that, if certain conditions in the proposed contract "are insisted upon, *it will undoubtedly mean our getting off the property altogether.*" On May 17th the receiver wrote that "the bondholders' committee, who expect to purchase the property, have approved the form of contract, and as the sale is set for June 28th we see no reason why negotiations should not be carried on in the proper spirit to a conclusion, so that the order of the court can be entered after the contract is signed, which will make it binding upon the succeeding company." On June 2d the receiver wrote: "It is necessary that we know what the plans of the Shore Line are in connection with future rights, in order that certain other arrangements can be made. If you are going to get off the property, if the contract is changed, we would be glad to know so; if not, *we think new contract should be executed without further delay.*" Two days later plaintiff asked "whether the purchasers of the property or the reorganized company would consider a proposition of joint ownership of the track between Trenton Junction and Delray."

The receiver invited such proposition, saying: "It is quite important that this matter be given prompt attention, as it is necessary to refer the action of same to the committee representing the bondholders." June 24th (four days before the foreclosure sale)

---

[8] Mr. Lowell, one of the three coreceivers between 1908 and 1912, had been, since about September 1, 1907, vice president and general manager of the Detroit, Toledo & Ironton *Railway* Company. During his receivership he acted also, for a time at least, as general manager for the receivers. After Johnson was made sole receiver, Lowell seems to have been retained for a time in the capacity of general manager. Johnson was made receiver at the request of the bondholders' reorganization committee, and seems to have consulted with that committee, or its representatives, regarding the new Shore Line contract, as well as other matters; prior to January 1, 1913, he also acted as general manager. Kurn came to the property as manager about February 1, 1914, at the request of the chairman of the bondholders' reorganization committee, and held that position until conveyance to the defendant, after which he was its president for about four years. Of the two purchasers on the foreclosure sale of 1913—Bannard and Buchner—the former was president, the latter vice president, of the New York Trust Company, which was trustee under one of the mortgages so foreclosed. Members of the bondholders' reorganization committee, of which Mr. Bannard was chairman, became directors of the defendant company. Mr. Main, superintendent and traffic manager of plaintiff railroad when the cancellation notice of 1909 was given, was its general manager from 1911 on, and during the entire period of new contract negotiations hereinafter referred to.

plaintiff's general manager wrote: "It was my idea that the contract might be formulated, and leave the question of value of the property to an agreement between us later; the amount to be decided upon in some equitable manner by representatives of both companies, and, if they fail to agree, by some fair method of arbitration." August 23d (nearly two months after the sale) plaintiff was advised: "It will be impossible at this time to consider a proposition of joint ownership. The bondholders' committee that bought the railroad are insisting that something be done toward getting a new contract with your people, and should be pleased to have you advise if you are now in position to *either accept or formally reject* the proposed contract submitted to you March 24th." Plaintiff replied that the proposed contract was not acceptable for a number of reasons, and that "the proposed increase in interest charges and percentage of earnings is, of course, prohibitory, so far as we are concerned, *and is virtually a notice to get off the property.*"[9]

Plaintiff suggested an interest charge on a fair property valuation and maintenance charge on the basis of business handled. On September 14th the receiver wrote plaintiff's president that "unless this matter is brought to a definite conclusion shortly, and better terms agreed upon between the two lines, the D., T. & *I. will take advantage of its rights and withdraw the privilege from the Detroit & Toledo Shore Line* of operation of its trains over our track. * * * The receiver is in position to close up and make any definite deal in connection with the D., T. & I. Railway, and there is no advantage to be gained by waiting for their reorganization." On September 17th plaintiff's president wrote the receiver that, "In case the D. & T. S. L. and the D., T. & I. cannot continue the present contract, or arrive at some conclusion that will be fair to the Shore Line, of course *it will be necessary for us to build our own* line to Trenton." September 22d plaintiff's president again brought up the subject of joint ownership. The receiver replied that the present arrangement was not a fair one, and that he did not believe the owners would consider joint ownership, and asked that an instruction be given plaintiff's general manager *"one way or the other."* September 29th (21 days before confirmation of report of sale) plain-

tiff's president wrote the receiver, expressing the hope that "some fair conclusion" might be reached "as between these two properties, permanently disposing of this question for all time to come," and saying: "It is only a question of how much we can afford to pay, and what we must consider is *what it would cost us to build our own line* and the interest charge on this, as against what you propose to charge us."

October 7, 1913 (13 days before confirmation of sale), plaintiff's president wrote that plaintiff had had a survey made with estimate of cost of two lines reaching the territory served, and saying: "We are in a position to trade with you on a joint ownership basis or we are in position to build." After another interchange of inconclusive letters plaintiff's manager, on October 30th (10 days after confirmation of sale), sent the receiver an engineer's summary of physical valuation of the mileage in question. The receiver replied on November 8th that he wanted "to take the whole proposition to New York and confer with the bondholders' committee or write them about it." A few days later the receiver presented the matter by correspondence to the chairman of the bondholders' committee, who reported that he would lay the same before the "new joint committee representing all divisions of the property" and recommended that the matter be not closed until that committee should be heard from. There were talks between the managers of the plaintiff and defendant respectively about February 2d or 3d. On February 5, 1914 (after the lapse of more than 90 days after confirmation of sale, but before conveyance to defendant or to the purchasers at the foreclosure sale), plaintiff's president inquired of the receiver what conclusions he had reached with reference to joint ownership. The receiver replied that he had referred the last-named letter to Mr. Kurn, "who is now on the property as general manager, and who will be elected president on March 1, 1914, and all matters can then be closed up." Plaintiff's president thereupon asked Mr. Kurn to go through the papers and advise him "as to the conclusions reached by your people." Kurn replied on the same date that "We are now working on new contract. It is now the intention to reorganize March 1st, and will be able to submit contract shortly after that date."

March 12th plaintiff asked permission to use a certain side track and to pay for it "under the terms of the old trackage agreement, until such time as a new agreement is

[9] If defendant was bound by the contract of 1903, either through express adoption or through failure to disavow, it could not terminate the contract except for plaintiff's default.

negotiated and signed." Defendant replied, now that application had been made for the use of that track, "we have included this with the others on the new contract at the interest rate charged for new tracks." March 19, 1914, defendant's president sent plaintiff's manager copy of the proposed new contract, with request for early attention, with a view of execution by both parties. Plaintiff's manager replied, on April 3d, that "the matter is being given consideration," and before submission to the executive committee asked for the construction of a certain feature of the contract, saying as to one paragraph that it could not be agreed to if given a certain meaning. Defendant declined to eliminate the paragraph referred to, but made a suggestion as to the other feature inquired about. On April 10th amended drafts of the proposed new contract were sent plaintiff by defendant's president, who said: "The terms in all are the same, the only difference being the new wording, and I hope you will be able to have them executed without delay." This new draft of contract between plaintiff and defendant provided for the superseding and cancellation of the 1903 contract between the Detroit Southern and the Shore Line, a rental of $1,500 per month for the term of 20 years, and thereafter until terminated by the other party by 60 days' written notice; also for payment by plaintiff of a share of taxes and maintenance expenses.

After some further correspondence regarding the details , defendant, on April 21, 1914, advised plaintiff that on account of extensive improvements contemplated on the track it would be necessary to put the rental in effect May 1, 1914, as indicated by contract previously submitted. Three days later plaintiff refused to be governed by the new contract, "protesting against any improvements, except the usual necessary improvements for safety, until such time as we have had a reasonable time to either reject or accept your contract, or have it modified if modifications seem fair and just." That letter contained the statement: "We have a contract that has been in effect for years and has years to run."

So far as we have been able to find, this is the first assertion by plaintiff of the continued existence of the contract of 1903 since the matter of new contract was taken up in March, 1913, or, in fact, since the cancellation notice of 1909. Considering the entire correspondence, we do not construe the reference to "present contract" in plaintiff's letter of September 17, 1913, as an assertion of the continued existence of the 1903 contract beyond mere sufferance. Mr. Main, plaintiff's manager, says he thinks he did not know of the decretal provision for disavowal until the period therefor had expired (presumably meaning January 18, 1914), although he admits he may possibly have known it the last 2 or 3 weeks of the 90 days. He admits that he knew in February, March, April, or May, 1914, for the last months of the receivership and the first 3 or 4 months when Mr. Kurn had possession as president of the D., T. & I. Railroad, they always claimed this old alleged contract was canceled, and that on March 12, 1914 (about 6 weeks before his letter of April 24th, already mentioned), he was "conscious that the D., T. & I. were determined that a new contract should be put into force and signed, and that they [the D., T. & I.] were going ahead with it."

We find in the record no satisfactory reason for his distinction between knowledge before or after the so-called 90-day disavowal period. The master found as facts that, until the receipt by defendant of the letter of April 24, 1914, defendant had no knowledge or notice that plaintiff made any claim that the contract of 1903 was still legally in effect, and that plaintiff at all times had knowledge of the purchaser's and defendant's lack of notice of the contract. We see no reason to reject these findings. After considerable further correspondence, especially regarding the necessity of certain improvements which defendant proposed to make, plaintiff, on July 2, 1914, returned unpaid defendant's bills for rental on the basis of the proposed new contract, and thereafter insisted that the 1903 contract was in full effect.

Having in mind that no conveyance was ever made to Bannard and Buchner, that defendant was not organized until February 20, 1914, and that the receivership continued until the conveyance to defendant on March 2, 1914, there seems much force in the thought that the 90-day disavowal period did not begin to run until the conveyance to defendant on March 2, 1914. Cf. D., T. & I. Ry. Co. v. Telegraph Co., 200 Mich. at page 7, 166 N. W. 494. Plaintiff is asking relief in a court of equity, and with the knowledge admitted to have been had on March 12, 1914, plaintiff would be clearly without standing to complain of lack of formal instrument of disavowal. As a practical proposition, Bannard and Buchner were, to say the least, not in position personally to operate the railway. Were we to assume

that the purchasing committee had legal power to accept or reject contracts of the mortgagor, an attempt by it to act under the disavowal clause might well be embarrassing. The committee's plan of organization might fall through, or the property be transferred to other ownership, which might not be satisfied with the action of the purchasing committee. There would seem, also, to be room for well-grounded doubt whether the word "deemed," before the word "adopted," necessarily means "conclusively held to have been." The court is presumed to have intended a just and reasonable order rather than an unjust and unreasonable provision for election. Cincinnati, I. & W. Ry. Co. v. Indianapolis Union Ry. Co. (C. C. A. 6) 279 F. 356, 365.

[3] But, admitting, for the purposes of this opinion, that the disavowal period ran from the date of confirmation of sale; and so expired January 18, 1914, we think plaintiff clearly estopped to claim adoption of the contract by defendant's failure formally to disavow it. We need refer only to certain decisions of this court: Miami, C. & M. Co. v. Allen, 257 F. 556, 557, 168 C. C. A. 540; Swift v. Salt Co., 233 F. 231, 147 C. C. A. 237; Davis v. Akron Co. (C. C. A.) 296 F. 675, 677; Letta v. Cincinnati Iron & Steel Co. (C. C. A.) 285 F. 707, 711, where it was said, "A party to a contract who knows that the other party is acting under a misconstruction, but permits that action to go on prejudicially, is bound by that misconstruction;" Lamborn v. Hardie Co. (C. C. A.) 1 F. (2d) 679, 682, where, after a careful review of the authorities, it was declared (as stated in headnote No. 2) that "estoppel may arise, not only from affirmative representation, but from silence, if there was a fairly clear duty to speak, and if the other elements of estoppel exist." We think the circumstances narrated in this opinion show that a clear duty to speak was imposed upon the plaintiff.

We find nothing in Fellows v. National Can Co., 257 F. 970, 169 C. C. A. 120, opposed to the conclusions we reach in the instant case. That case was decided upon the application to its facts of the rule that "silence alone could not estop plaintiff, unless he was legally or in good conscience bound to speak." In the instant case, in the presence of the active negotiations for a new contract, and in the face of the natural inference that defendant regarded the old agreement at an end, and making due allowance for the fact that defendant had an absolute right to disavow, we think plaintiff was "in good conscience bound to speak."

[4] Upon this record, we think defendant's representatives not negligent in failing to know that the contract had not been legally canceled, in view of plaintiff's conduct, which we think naturally had the effect of lulling the defendant into a sense of security in its construction of the situation and of plaintiff's understanding of it. Nor is the situation presented due merely to a mistake of law. True, while the receivers had power to reject the contract, so far as receivership operation was concerned, they had no authority finally to cancel, so far as the rights of the D., T. & I. Railway and plaintiff were concerned, and there is no proof of such actual cancellation. But, so far as the question of equitable estoppel is concerned, it is not of controlling importance that plaintiff's general officers had no power to accept cancellation or to make a new contract, nor that the railway company had no power to cancel except for cause. A representation by plaintiff, expressly or by implication, that it conceded defendant's position that the contract was at an end, and prejudicial reliance on such representations would estop it, even if the concession was based upon a mistake of law.

Plaintiff suggests no reason for defendant's failure to disavow, except that (as its counsel suggests) defendant forgot the disavowal provision and/or erroneously reckoned the disavowal period from March 2d instead of January 18th. We think this suggestion not corroborated by the record. On the contrary, Mr. Cook, counsel for the bondholders' committee, as well as one of the counsel for the purchasing committee, and who had become, as early as March, 1913, actively connected with the subject of preparation of the proposed new contract, testified that he was told by Receiver Johnson that the contract had been canceled, and that the Shore Line people and the D., T. & I. representatives were negotiating a new contract, "so there was no reason from my viewpoint, why I should give notice of cancellation with respect to it. I had already been informed and advised it had already been canceled," and that, "so far as I was concerned, or anybody here in New York, if we had had the slightest idea that the old contract had not been canceled, we would not have devoted our time to entering into a new one, and would have given notice of the cancellation."

The record is convincing that Mr. Cook's associate as counsel for the purchasing com-

mittee, and who was also counsel for the New York Trust Company in the foreclosure suit, never had the contract in question brought to his attention during the time of the receivership, and that he never heard of it "until the last two months, when these inquiries were made."

[5] In view of the representations and assurances given the representatives of defendant that the old contract was out of the way, and plaintiff's attitude toward that subject, we think the consideration of equal opportunity to know the facts has little application.

In view of the record generally, we are not impressed that the meritorious conclusions we have reached are at all discredited by the reference in the correspondence to the new contract as "to supersede contract of July 1, 1903," nor by the express provision therefor in the proposed new contract, nor by the references in the rental vouchers and bills to the 1903 contract, whose terms were being temporarily followed. We cannot escape the conviction that the fastening upon defendant of the old contract until the year 2002 is inequitable, and without regard as to whether its further continuance would be unconscionable as between the original parties to it. Conditions have apparently changed very materially between the contract date and defendant's purchase of the road. This conclusion of inequitableness is the more compelling in view of the seeming admission of plaintiff's counsel, in the court below, that during the pendency of this suit plaintiff had built its own railroad into Detroit, and uses defendant's tracks only for the purpose of doing a switching business to reach industrial spurs on defendant's main line tracks between Delray and Trenton.

The decree of the District Court is reversed, and the record remanded to that court, with directions to take further proceedings not inconsistent with this opinion.

