## WILSON & TOOMER FERTILIZER CO. v. AMERICAN CYANAMID CO.

Circuit Court of Appeals, Fifth Circuit.
July 17, 1929.

No. 5453.

George C. Bedell and Robert R. Milam, both of Jacksonville, Fla. (Arthur Y. Milam, of Jacksonville, Fla., and E. T. McIlvaine, of Miami, Fla., on the brief), for appellant.

Peter O. Knight, James F. Glen, C. Fred Thompson and A. G. Turner, all of Tampa, Fla., for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

BRYAN, Circuit Judge. Appellant sued appellee upon a written contract for the purchase and sale of pebble phosphate. The contract was between appellant as purchaser and the Amalgamated Phosphate Company as seller, and called for the annual delivery of twelve to eighteen thousand tons, at purchaser's option, for ten years, beginning January 1, 1913; it provided that shipments should be billed during the first five years at $2.70 per ton, and thereafter at $2.80 per ton f. o. b. seller's mines, but that the purchaser should have the benefit of the seller's lowest selling price to any other party to the extent of the amount of tonnage sold at the lowest price during each year separately. The action was brought against appellee only, on the grounds that in 1916 it acquired all the capital stock of the phosphate company, took a lease for 30 years of all that company's property, and, as a result of the exclusive manner in which it managed and controlled both the property and the company itself, succeeded to all the rights and liabilities of the seller under the contract; that, after 1918, it failed to allow to appellant the benefit of the lowest price, but, on the contrary, collected the maximum price of $2.80 per ton. The aggregate amount of the alleged overcharges, measured by the difference between the minimum and maximum contract prices on the tonnage involved, was sought to be recovered. Appellee relied on the lease as a defense on the merits, and, alleging that it had never bound itself in writing to perform the contract, pleaded the statute of frauds as a bar to the action. At the conclusion of appellant's evidence, the court directed a verdict for appellee, upon which judgment was subsequently entered.

There was evidence for appellant to the following effect: In 1911 appellant and four other firms or corporations interested in the fertilizer business incorporated the Amalgamated Phosphate Company, and conveyed

to it certain contiguous tracts of phosphate land which they owned severally, in consideration of the capital stock of that company which was issued to them and held under a voting trust for their common benefit. The phosphate company, shortly after it was organized, made the contract in suit with appellant, and made similar contracts with the other incorporators. Its contract with appellant was mutually complied with, and appellant received from it the benefit of the lowest selling price, until August of 1916, when appellee acquired all its capital stock. Appellee thereafter continued to own all the capital stock of the phosphate company up to the time of the trial. In October of 1916 the executive officers of the appellee company were elected to the same positions as officers of the phosphate company, and directors of the former company made up a majority of the directors of the latter company. Thereafter, until 1923, the officers of the two companies were identical, and the majority of the directors of the phosphate company were either directors or employees of appellee. On December 29, 1916, the phosphate company leased all its real and personal property to appellee for 30 years, or until the real property "shall have become exhausted or its deposits of phosphate rock shall have become commercially unprofitable." As rental appellee agreed to pay, not to the phosphate company, but directly to the parties entitled to receive the same, (a) interest and sinking fund on an outstanding bond issue, and (b) taxes, insurance, and overhead administration expenses of the phosphate company. Appellee agreed to deliver to the phosphate company f. o. b. tracks at the mines sufficient phosphate to fill the latter's existing contracts, including the one with appellant, at cost, plus 15 per cent. Items of cost included unlimited administrative expenditures by appellee. The lease was executed on behalf of both the lessor and the lessee by the same individuals, acting in the dual capacity of president and secretary respectively of each corporation. It was not recorded until November 6, 1922, and appellant did not earlier become aware of its existence.

Notwithstanding appellee's ownership of the phosphate company's stock and the just-mentioned lease, appellant continued to receive the benefit of the lowest selling price during the years 1916, 1917, and 1918, but, beginning in 1919, and continuing to the end of the contract period, it was required to pay, and did pay, the maximum price of $2.80 per ton, although sales of phosphate from the leased lands were regularly made from year to year at lower prices. Appellant accepted all the phosphate it obligated itself to take throughout the entire contract period, and was required to pay about $36,000 more than was collectible under the terms of the contract. From the date of the lease, appellee assumed and exercised the complete and exclusive management and operation of the phosphate mines. It made deliveries of all phosphate sold, including that covered by appellant's contract. Its officers and representatives carried on considerable correspondence with appellant upon detail matters relating to the contract, usually in the phosphate company's name, but in many instances in its own name, although, as was explained by appellee's general manager, who also was assistant to the president of the phosphate company, stationery of a distinctive color was adopted for use in correspondence on behalf of the phosphate company in order to avoid confusion. Instructions to the superintendent at the mines were quite uniformly issued in appellee's name. Appellee caused the books and records of both companies to be kept by its own employees. It caused all the money that was payable to the phosphate company on the contracts existing at the date of the lease to be paid into its own treasury, and in this way at the time of the trial was indebted to the phosphate company in the sum of $1,350,000, exclusive of interest. None of this indebtedness was secured; but $450,000 was evidenced by demand notes, and the balance of $900,000 was upon open account. During all this time, appellant had no representative at the mines in Florida, and was wholly inactive, except that in New York City it had common offices with appellee, at which it was represented by the same officials that represented appellee.

Appellant introduced in evidence the deposition of an accountant for appellee and the phosphate company. It appeared from this deposition that the phosphate company, according to its records, made sales of phosphate during 1917 and 1918 at prices lower than $2.80 per ton, and that it, not appellee, made adjustments with appellant for those years.

The subject-matter of both the contract and the lease was phosphate on particularly described land. Appellee's rights and interests in phosphate on other lands are not here involved. The lease provided that appellee should mine and sell all the phosphate, except just enough to fill the phosphate company's existing contracts, including the one with appellant. The phosphate company

therefore had no phosphate which it could sell at less than the maximum contract price. Appellee, of course, was free to fix the prices at which it would sell. Hence the lease is put forward as a basis for the contention that a breach of the contract was not shown by proof of a failure to comply with the seller's contractual obligation to allow appellant the benefit of the lowest selling price. Appellant was accorded that benefit during the first two years after the lease was executed, but it was somewhat inconsistently explained that sales below the maximum price were made during those years by the phosphate company, and a statement taken from its records is cited in proof of that explanation. It is true that a provision of the lease could be waived by the parties to it; but it is a reasonable inference that these, as well as the later, sales were made by appellee, for, as just stated, the phosphate company had no phosphate which it was at liberty to sell.

It is argued that the sales at the maximum price were made for and in the name of the phosphate company; that this company had a separate corporate existence; that, as it made no sales after 1918 at lower prices, appellant got all the phosphate it was entitled to receive, and the contract was not breached; and that appellee, by selling at lower prices, did not violate any contract right of appellant. In short, the defense on the merits comes to this, that the lease should be accepted at its face value. In our opinion, based upon appellant's evidence, which was unexplained and uncontradicted, that defense ought not to be sustained. Appellee acquired all the capital stock of the phosphate company, and put its own executive officers and directors in exclusive control of the phosphate company's affairs. It then took a secret lease of all the phosphate company's property, both real and personal. That lease reserved no fixed rental, but permitted the lessee to charge unlimited administrative and overhead expenses, thus conferring upon appellee the power to refuse to pay any rent to the phosphate company. The lease was kept secret for the obvious purpose of compelling appellant, and perhaps others similarly situated, to pay more than the market price for phosphate. Appellant, as well as the phosphate company, was bound by the contract, and therefore had no right to refuse to accept delivery of phosphate at the maximum price on the ground that the market price was lower. The delivery of phosphate to appellant at the maximum contract price did not confer any benefit upon it, although curiously enough the argument is advanced that it was supplied with all the phosphate which it was entitled to receive. Appellee took exclusive charge of the leased property, mined, sold, and delivered all the phosphate that was taken therefrom; had its representatives conduct all the correspondence, and keep the books and records of the phosphate company; and finally caused all the revenues earned by the phosphate company under contracts with appellant and others in like situation to be placed in its own treasury.

The phosphate company, after the date of the lease, did not have a single representative at the mines, or separate official, agent, or employee of its own in the New York offices which it was permitted to share with appellee. It had nothing to do or to do with, because of the manner in which appellee performed the lease and the contract, and it is difficult to see that it had any need for offices or stationery, except to preserve the fiction of its corporate identity. Every corporate act that was done after the date of the lease was in reality the act of appellee. Therefore appellee was in as complete control of the phosphate company as it was of the leased property; its power over both was absolute, and was used for its own benefit.

Appellee, having exercised complete control over the leased property and complied with appellant's contract for two years, must be held to have recognized that contract as binding upon it. It could not thereafter take the position that it was a stranger to the contract, and was estopped to deny the obligation to accord to appellant the benefit of the lowest selling price. Otherwise it would be permitted to enjoy the benefits and escape the burdens of the contract. Its obligation rests, not upon its formal consent to be bound, but upon the principle of estoppel. In Wiggins Ferry Co. v. Ohio, etc., Ry. Co., 142 U. S. 396, at page 408, 12 S. Ct. 188, 192 (35 L. Ed. 1055), it was said:

"It is not necessary that a party should deliberately agree to be bound by the terms of a contract to which he is a stranger, if, having knowledge of such contract, he deliberately enters into relations with one of the parties, which are only consistent with the adoption of such contract. If a person conduct himself in such manner as to lead the other party to believe that he has made a contract his own, and his acts are only explicable upon that theory, he will not be permitted afterwards to repudiate any of its obligations."

See, also, Chicago & Alton R. Co. v. Chi-

cago Coal Co., 79 Ill. 121, cited with approval by the Supreme Court in the Wiggins Ferry Co. Case; Taenzer & Co. v. Chicago, etc., Co. (C. C. A.) 170 F. 240; Swift & Co. v. Detroit Rock Salt Co. (C. C. A.) 233 F. 231. ▮ The only inference sustainable by the uncontroverted evidence is that beginning with 1919 appellee used the lease as a device to avoid the phosphate company's contractual obligation and to enforce that of appellant. It is of no consequence that the phosphate company had a valid corporate franchise, or that phosphate was sold and delivered in its name. It was shown to be nothing but an instrumentality or agency of appellee which owned it and controlled its every action. To uphold the lease under such circumstances would be to sacrifice substance to mere form. Chicago, etc., Ry. Co. v. Minneapolis Civic & Commerce Association, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; Luckenbach S. S. Co. v. W. R. Grace & Co. (C. C. A.) 267 F. 676; Fourth National Bank v. Portsmouth Cotton Oil Co. (C. C. A.) 284 F. 718; 1 Fletcher on Corporations, § 42. The contract in suit had been fully performed by appellant, and therefore the action was not barred by the statute of frauds (Comp. Laws Fla. 1927, § 5780). Bibb v. Allen, 149 U. S. 481, 497, 13 S. Ct. 950, 37 L. Ed. 819.

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

WALKER, Circuit Judge (dissenting). After the appellant had received all the pebble phosphate to which it was entitled under its contract with the phosphate company, it brought this suit, asserting the claim that the appellee was liable for the amount of the difference between the contract price paid by appellant for phosphate delivered after the expiration of two years from the date of the lease and the lower prices at which during that period phosphate from the leased property was sold to others. The claim asserted that appellee was liable under a provision of a contract to which it was not a party, was sought to be sustained on the following grounds: (1) That following the making of the lease appellee assumed the phosphate company's liability under the contract by treating that contract as its own, and complying with the obligations which the contract imposed on the phosphate company; and (2) that appellee, by taking over all the property of the phosphate company, absorbed that corporation and disabled it from complying with its obligations under the contract.

The conclusion that appellee assumed the phosphate company's liabilities under the contract is not consistent with the uncontradicted evidence to the effect that the phosphate company remained in existence with a separate corporate organization until the completion in its name of the deliveries of phosphate called for by the contract, that the lease provided for the appellee furnishing to the phosphate company the phosphate required to fill the phosphate company's existing contracts, and that the deliveries of phosphate to appellant were made pursuant to its orders or shipping directions, usually addressed to the phosphate company, for and in whose name the deliveries were made, and that throughout the period when appellant was getting the phosphate called for by the contract it was having dealings with both appellee and the phosphate company in their respective names, buying from appellee things other than pebble phosphate, while the stipulated deliveries were being made for and in the name of the phosphate company. The evidence negatived the conclusion that appellee consented to assume the phosphate company's obligations under the contract, or that, by leading appellant to believe that it assumed the phosphate company's obligations under the contract, it estopped itself to deny that it assumed those obligations.

The evidence did not show that the lease had the effect of depriving the phosphate company of the means of complying with its obligations under the contract. It is apparent that the making of the lease was without effect upon the ability of the phosphate company to comply with any provision of the contract other than the one as to appellant having the benefit of the minimum price, as the lease itself provided for the furnishing to the phosphate company of the phosphate required to enable it to make the deliveries to appellant called for by the contract, and the required amount of phosphate was furnished, and all the stipulated deliveries were made. The provision of the contract as to appellant having the benefit of the minimum price accorded by the phosphate company to any other purchaser was not applicable, in the absence of the phosphate company during any year actually making a sale or sales to another or others at a price less than that stated in the contract. The contract conferred on the appellant no right to require the phosphate company to continue to make sales of phosphate to others than appellant, or to have the benefit of the minimum price

816

at which phosphate from land owned by the phosphate company when the contract was made was sold by one who during the period covered by the contract acquired the ownership or control of that land. As the contract left the phosphate company free to discontinue sales of phosphate not already contracted for, no contract right of the appellant was violated by the phosphate company discontinuing sales of phosphate other than those it was under contract to make to appellant. No right of the appellant was violated by the appellee so using the power it possessed by reason of its ownership of all the capital stock of the phosphate company as to permit the phosphate company for about two years from the date of the lease to make sales of phosphate to others than appellant, and after the expiration of two years from the date of the lease to restrict its sales of phosphate to such sales as it had, prior to the date of the lease, obligated itself to make.

For sales to others than appellant of phosphate from the leased land at prices lower than that stated in the contract to have the effect of entitling appellant to the benefit of the minimum price, such sale or sales at lower prices must have been made by the phosphate company—the provision as to the minimum price governing being such a one that the applicability of it was subject to the condition or contingency of sales of phosphate at less than the contract price being made in any year by the phosphate company. The contingent nature of that provision made it unlike the one which unconditionally conferred on appellant the right to receive the amount of phosphate contracted for. If such sales were made, not by the phosphate company, but by the lessee, the appellee, the invoked contract provision was not applicable. That provision cannot properly be given the same effect it would have had if it had been so framed as to give to appellant the benefit of the minimum price at which during any year within the period covered by the contract phosphate from land owned by the phosphate company when the contract was entered into was sold to another or others by either the phosphate company or its successor in the ownership or control of that land. To subject the appellee to the liability asserted, it is not enough that it used its power as lessee to keep the phosphate company from selling any phosphate except such as, prior to the making of the lease, it had obligated itself to sell. It seems to me that the court's ruling is sustainable on the ground that the evidence showed that appellant got all the phosphate it contracted for, that the burden was on the appellant to prove that it failed to get the stipulated benefit of any sales of phosphate made by the phosphate company at a price less than that stated in the contract, and that the evidence adduced was not such as to warrant a finding that during any year in question the phosphate company sold to another or others phosphate at a price less than that stated in the contract. The evidence as to sales of phosphate relied on as giving rise to liability under the provision according to appellant the benefit of the minimum price well may be regarded as having no tendency to prove that those sales were made by the phosphate company, or were such sales as gave rise to the liability asserted.