## AMERICAN CYANAMID CO. v. WILSON & TOOMER FERTILIZER CO.

No. 5919.

Circuit Court of Appeals, Fifth Circuit.
July 21, 1931.

FOSTER, Circuit Judge, dissenting.

John W. Davis, of New York City, Stafford Caldwell, of Jacksonville, Fla., and Charles Caldwell, of New York City, for appellant.

George C. Bedell, Robt. R. Milam and A. Y. Milam, all of Jacksonville, Fla., and E. T. McIlvaine, of Miami, Fla., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

Wilson & Toomer Fertilizer Company, referred to hereafter as plaintiff, sued American Cyanamid Company, referred to as defendant, at law to recover overcharges on phosphate rock delivered in the several years 1919 to 1923, inclusive, under a long-time contract for its purchase which plaintiff had made with Amalgamated Phosphate Company in 1911 and modified in 1912. The suit was in four counts; the third being a common count for money had and received. The first, second, and fourth were special counts which set up the terms of the contract, and that the defendant had in 1916 acquired all the capital stock of the phosphate company, and leased its mines and equipment, and had thereupon adopted the contract with plaintiff's consent, or else had so conducted itself with reference thereto as to estop it from denying adoption, and to amount in law thereto, but had continued to use in the business

the name of the phosphate company which it dominated only in order to conceal the adoption and enjoy the advantages of the contract without incurring its burdens in a special particular, to wit, a clause that provided that the plaintiff should each year have the benefit of any price lower than the contract price of $2.80 per ton which the seller might make in such year on sales followed by delivery to others. A verdict was directed for the plaintiff against the defendant for over $60,000, and appeal taken by the defendant.

The first question we face is the effect of the decision of this court upon a former appeal. 33 F.(2d) 812. There was a reversal by a divided court, with a general remand for further proceedings not inconsistent with, the majority opinion. We have here, therefore, no question of enforcing a specific mandate. The one ruling discussed in the majority opinion was the direction by the court below of a verdict in favor of the defendant at the conclusion of the plaintiff's evidence. After a general consideration of the law and the evidence so far as it had gone, the majority decision was that upon the plaintiff's evidence "uncontradicted and unexplained" the directed verdict was wrong. The dissenting judge thought otherwise. It was also ruled that the statute of frauds was not a defense, because the plaintiff had fully performed its side of the contract in dispute. No other distinct rulings were made. The evidence for the defendant has now been offered, which puts a different face on several matters discussed in the former opinion and rebuts some others. The former opinion under such a mandate is not necessarily an adjudication of any questions save those in terms decided. Wolff Paving Co. v. Court of Industrial Relations, 267 U. S. 552, 45 S. Ct. 441, 69 L. Ed. 785; Mutual Life Ins. Co. v. Hill, 193 U. S. 551, 24 S. Ct. 538, 48 L. Ed. 788. We think under the present evidence we are at liberty to re-examine the facts and the entire law applicable to them.

At the new trial pleas of limitation were offered by the defendant to each count, which were allowed to be filed, but were stricken on motion upon the grounds that each was offered as a bar to the count but did not answer the entire count and that neither plea was a good answer in whole or in part to the count to which it was addressed. The former ground was untenable. The counts all sought recovery for rebates due for 1919, 1920, 1921, 1922, and 1923. The suit was begun August 22, 1924. The plea to each count was that "all parts or portions thereof relating to alleged causes of action arising out of purported transactions between plaintiff and defendant before August 22nd, 1921, occurred, if at all, more than three years before the institution of this suit." On their face these pleas do not profess to answer the whole counts, and are not demurrable for this insufficiency. In such case at common law, where only one plea in bar could be filed, the plaintiff could not demur but took judgment as by nil dicit as to the portion of the count not answered, and replied to the plea as to the remainder. Steven on Pleading, 216. In Florida, where more than one plea in bar may be filed, a plea which answers only a divisible part of the count is permissible as to that part, although other pleas prevent a judgment as to the remainder of the count until they are disposed of. Hartford Fire Ins. Co. v. Hollis, 64 Fla. 89, 59 So. 785; Cosmopolitan Ins. Co. v. Putnal, 60 Fla. 41, 53 So. 444. Whether the lapse of three years does bar any part of the counts depends upon the causes of action declared on. The laws of Florida, Compiled General Laws of 1927, § 4663, provide a limitation of twenty years for "an action upon any contract, obligation, or liability founded upon an instrument of writing under seal," and five years if "founded upon an instrument of writing not under seal," and three years for an action for fraud, or an action "upon a contract, obligation or liability not founded upon an instrument of writing." The third count is for money had and received, and exhibits no contract, but only a bill of particulars "For overcharges on phosphate rock" at stated dates and for stated amounts. Claiming on its face no written contract for its foundation, the three-year limitation appears to be applicable to this count, and the plea applying to it should not have been stricken. Counts 1, 2, and 4 are also for overcharges or rebates on phosphate rock, but exhibit written contracts and plead the express promise therein that plaintiff should have the benefit of a lower price than that specified in the contract upon certain contingencies which are claimed to have happened. These counts are founded on these contracts. It is true the defendant did not sign the contracts, but it is claimed in count 1 that it "assumed" it, and thus intentionally made it its own contract, and in count 4 that defendant wrote plaintiff certain letters manifesting a purpose to adopt it; and in counts 2 and 4 that certain conduct of the defendant had this effect, whether so intended or not. The

Florida statute does not require that the written contract be signed by the defendant. If the defendant in any of these ways became bound by the terms of the writing, whether under seal or not, the action is founded upon the writing within the meaning of the Florida statute, and is limited accordingly. Brownson v. Hannah, 93 Fla. 223, 111 So. 731, 51 A. L. R. 976. To a like effect in other states are Kytle v. Kytle, 128 Ga. 387, 57 S. E. 748; Atlanta, K. & N. R. R. Co. v. Mc-Kinney, 124 Ga. 929, 53 S. E. 701, 6 L. R. A. (N. S.) 436, 110 Am. St. Rep. 215; Gilles v. Miners' Bank (Tex. Civ. App.) 198 S. W. 170; Schmidt v. Louisville R. R. Co., 139 Ky. 81, 129 S. W. 332; Houston Saenger-bund v. Dunn, 41 Tex. Civ. App. 376, 92 S. W. 429; Schmucker v. Sibert, 18 Kan. 104, 26 Am. Rep. 765. The fourth count which was allowed as an amendment on September 4, 1926, though exhibiting along with the contract the two letters claimed to be written by defendant, did not thereby introduce a new cause of action so as to fix its allowance as a new date for measuring its limitation. The letters make no express reference to the contract, and contain no promise to rebate or reduce the price. They are not the foundation of the fourth count, but at most are acts or admissions, if authorized, which might tend, along with the other facts, to show an adoption of the contract by defendant. We reject the contention that any count is for a fraud or other tort. A few expressions might so indicate, but the gravamen of the counts is the promise of the contract, as was held in the first sentence of our former opinion. The three-year limitation has no application to counts 1, 2, and 4.

■■ The motion to transfer the case to the equity docket was properly overruled. We think no cause of action set forth was necessarily equitable. With some exceptions of concurrent jurisdiction where the plaintiff may make his choice of forum, a case is equitable only when some remedy is sought which equity alone can give, or some right set up which equity alone will recognize. No relief is here prayed, save a money judgment. Count 3 is the legal action for money had and received. Count 1, while it alleges that the defendant "assumed" the plaintiff's contract with Amalgamated Phosphate Company, does not set up any promise from the defendant to the phosphate company to do so which the plaintiff is seeking to enforce, but rather that defendant with plaintiff's acquiescence and consent took over and adopted the contract, thereby effecting a novation,

in consequence of which defendant came directly into legal privity with the plaintiff. This is also the theory of the second and fourth counts. The fourth count also exhibits a lease between defendant and the phosphate company, but the lease contains no promise from the defendant to the phosphate company to assume the contract, but rather a promise by the defendant to the phosphate company to furnish it with the means of performing the contract for itself. The theory of the second and fourth counts we understand to be that, if defendant did not purposely adopt the contract as its own, its conduct was such as to estop it to deny such adoption, and to amount in law thereto. It has been held in many jurisdictions that plaintiff would have to enter equity to obtain enforcement of a promise from defendant to the phosphate company to carry out the latter's contract. Keller v. Ashford, 133 U. S. 610, 10 S. Ct. 494, 33 L. Ed. 667; Willard v. Wood, 135 U. S. 309, 10 S. Ct. 831, 34 L. Ed. 210; Second National Bank v. Grand Lodge, 98 U. S. 123, 25 L. Ed. 75. But if defendant adopted the contract, taking the place of the phosphate company in it with plaintiff's consent, there was a virtual novation and no need for entering equity to enforce the resulting obligation. Taenzer v. Chicago R. R. Co. (C. C. A.) 170 F. 240; Chicago & Alton R. R. Co. v. Chicago Coal Co., 79 Ill. 121; Swift & Co. v. Detroit Rock Salt Co. (C. C. A.) 233 F. 231. Estoppel by conduct to deny such an adoption has been applied in equitable suits. Wiggins Ferry Co. v. Ohio R. R. Co., 142 U. S. 396, 12 S. Ct. 188, 35 L. Ed. 1055. But law courts also enforce so-called equitable estoppel. Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79; Taenzer v. Chicago R. R. Co., supra. From this construction of the counts it also follows that there is no mixing of contract and tort, nor of legal and equitable causes of action, and consequently no error in refusing to compel an election between the counts, or to strike out portions of them.

The counts were specifically traversed, and additional facts were pleaded to show defendant's real relation to the contract, and that there was no intent to adopt it and no necessary inference of adoption. Upon the pleadings thus settled it was proven on the trial that the contract was made by Amalgamated Phosphate Company, and performed by it until August, 1916, when the entire capital stock of that company came to be owned by defendant. During that fall the defendant, as shown by its directors' minutes,

"desiring to more directly own or operate the properties of the Phosphate Company," appointed a committee to consider the situation. As a result it was decided not to own, but to operate, and on December 29, 1916, the much-discussed lease was made from the phosphate company to defendant demising the phosphate mines and their equipment for a term of thirty years or until within that period the mines should be exhausted. The defendant as lessee bound itself (1) to operate the mines; (2) to pay annually as rent to the lessor an amount equal to the 5 per cent. interest on its $1,400,000 of outstanding bonds, to wit, $70,000, taxes, insurance, and lessor's administration expenses, and a royalty of 10 cents per ton on rock taken out, to be in no year less than the sinking fund payment due to be made by lessor under its bond mortgage. This royalty ran from $40,-000 to $100,000 per year; (3) to deliver to lessor on cars at the mines all the phosphate rock needed by lessor to fulfill its outstanding contracts, including that of plaintiff, at a price of 15 per cent. over cost, ascertained on an agreed basis; (4) to install additional equipment necessary to produce the phosphate rock promised above, with leave to put in still other equipment; (5) to maintain the properties in good condition and deliver them back in such condition at the end of the lease, lessor to have the right at its end to purchase any or all equipment added by lessee at valuations to be arrived at in an agreed way, lessor to have the right to remove them if not so purchased; (6) to maintain reasonable fire insurance. The lessor on its part covenanted to pay the principal and interest of the bonds and taxes as they matured, and to make no further liens on the property. The two companies now had the same officers, and they executed the lease for each. The lease was at once put into effect. The additional equipment to a value of about $500,000 was added, the promised payments made, and the promised phosphate rock delivered by the lessee. The lessor company had no other active business, but its corporate organization was kept up, and its separate books and treasury maintained, though by persons who also served the defendant. The lease was not recorded, but in operating the mines the defendant placed its sign on the premises and marked the equipment with its name; its own stationery was used for its business and a different stationery for that of the lessor, and defendant in no wise concealed the fact that it was in possession, and made no misstatement as to the nature of its possession. The deliveries of phosphate rock to plaintiff were billed to it in the name of the phosphate company, and paid for by checks payable to and collected by the phosphate company. Prices were adjusted as before by reduction to the lowest prices at which the phosphate company had delivered rock to others each year; payment of the rebate being made by the phosphate company's check. Much of the money of the lessor was used by the lessee, some borrowed on note and some on open account, but accurate records of the transactions were kept on the books of both companies. In 1919, the high cost of operation which attended and succeeded the World War having rendered the phosphate company's long-time contracts at low prices very burdensome, efforts were made to get plaintiff and others who held similar contracts to make some adjustment, which were successful with all except plaintiff. The price to plaintiff was practically fixed by long-time contracts with Armour & Co. and others at prices as low as $1.80 per ton. They were thus not alone unremunerative in themselves, but lowered the price to plaintiff. These low-price contracts were procured to be canceled, some being substituted by new contracts direct with defendant, but still at prices lower than plaintiff's contract price of $2.80. As the lessor, the phosphate company, was no longer making these low-price sales, it assumed that no rebate was due to plaintiff, and none was thereafter made. This suit is to recover the difference between plaintiff's contract price and the lowest sales executed by the defendant under these substituted contracts.

It was apparently considered in the court below that the lease between parties related as these corporations were, and carried out as this one was, and with the results reached, was necessarily to be disregarded, and the entire transactions to be attributed to the defendant as the dominating actor in them, leaving no possible conclusion but that defendant had adopted the plaintiff's contract, had violated its terms, and was liable. Accordingly much evidence, documentary and oral, was excluded which was offered to show the circumstances which attended the making of plaintiff's contract and the acquisition by defendant of the stock of the phosphate company, and the financial condition of the phosphate company at the time of the lease and at the time of the substitutions for the low-price contracts, and the purposes of the parties in these transactions, and the necessity of them to avoid the failure of

the phosphate company. Nearly a hundred exceptions relate to these rulings. We see no relevancy of the evidence touching the making of the contract with plaintiff. That contract was of force when the defendant came into the business. Its meaning is not in dispute. It must have accorded to it what it calls for and nothing more. Nor do we see how the history of the acquisition of the stock in the phosphate company by defendant is material; there being no claim in the declaration that there was any wrong in its acquisition. The financial condition of the phosphate company after defendant became its owner, and the purposes in view when the lease was made, are a part of the case declared on, and the evidence thereabout should have been admitted. So the condition of the phosphate company and its business and the real purpose of substituting the contracts with Armour & Co. and others were relevant. The plaintiff claims that adoption of its contract had already occurred; the lease being a scheme to conceal it, or at least being disregarded in the adoption, and that the substitution of these low-price contracts did not affect the defendant's liability. The defendant contends that the lease was an actual business transaction intended to be carried out according to its terms, that no adoption of plaintiff's contract was intended or effected, and that the substitution of the low-price contracts was a lawful act to aid a bad situation. Evidence that the market price of rock during these periods was above plaintiff's contract price was also rejected. We think it has some bearing on the motives of the parties, especially if the substituted contracts carried a compromise price less than the market. Of course the market price in no wise affected the obligation of the plaintiff's contract, but only illustrates the conduct and purposes of the parties in what was being done. Evidence to show that plaintiff knew of the lease and had no cause to suppose that defendant had taken over and adopted the contracts of the phosphate company was offered. Such a fact would be relevant to the issue. But knowledge of mere stockholders and of friends of the officers of the plaintiff would not by itself bring home notice to the plaintiff. We cannot deal separately with the assignments of error, but regard what has been said as a sufficient guide in dealing with the evidence upon another trial.

Combining the evidence admitted with that erroneously excluded, a verdict was not demanded for the plaintiff. As a rule, one who contracts with a corporation must look to it alone for performance. The ownership by defendant of all the stock of the phosphate company did not merge the corporations, nor did the having of the same officers and offices end the corporate activity of either or by itself make one a mere agency or instrumentality of the other. Peterson v. Chicago, Rock Island & P. R. R. Co., 205 U. S. 364, 27 S. Ct. 513, 51 L. Ed. 841; Conley v. Mathieson Alkali Works, 190 U. S. 406, 23 S. Ct. 728, 47 L. Ed. 1113; Pullman Co. v. Missouri Pacific R. R. Co., 115 U. S. 587, 6 S. Ct. 194, 29 L. Ed. 499; In re Watertown Paper Co. (C. C. A.) 169 F. 252; Pittsburgh & Buffalo Co. v. Duncan (C. C. A.) 232 F. 584. This is not the case of one corporation taking the assets of another by lease or otherwise without paying a fair value, and leaving it without means to meet its previous obligations, as in Chicago, Milwaukee & St. Paul R. R. v. Third National Bank, 134 U. S. 276, 10 S. Ct. 550, 33 L. Ed. 900; Northern Pacific R. R. Co. v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931. Nor is it the case of a responsible corporation organizing or using an irresponsible one which it controls to carry out some business of the former but yet to screen it from liability in case of misfortune as in Luckenbach S. S. Co. v. Grace (C. C. A.) 267 F. 676; Portsmouth Cotton Oil Refining Corp. v. Fourth National Bank (D. C.) 280 F. 879, affirmed (C. C. A.) 284 F. 718. Nor is it a case where in evasion of public duty or public law a part of the corporation's business is put into or handled through a controlled subsidiary, as were Chicago, Milwaukee & St. Paul R. R. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; United States v. Lehigh R. R. Co., 220 U. S. 257, 31 S. Ct. 387, 55 L. Ed. 458; United States v. Delaware, Lackawanna & W. R. R. Co., 238 U. S. 516, 35 S. Ct. 873, 59 L. Ed. 1438. Nor yet a case where a third party takes over an existing contractual situation, his predecessor ceasing to figure in it, and begins to carry it on and enjoy its benefits, his acts being consistent only with the adoption of the contract and explicable only on that theory, and thus leads the other party to believe he has made the contract his own, as Wiggins Ferry Co. v. Ohio R. R. Co., 142 U. S. 396, 12 S. Ct. 188, 35 L. Ed. 1055. The jury might have found the following to be true: The phosphate company was a substantial corporation having about $3,000,000 of assets. The lease did not convey away these assets, but, considering the unfavorable state of the

company's business, made a justifiable and fair disposition of them. The fixed rental to be paid, including bond interest, taxes, insurance, administration expenses, and royalties, might have amounted to $200,000 annually. The phosphate company's outstanding obligations were to be scrupulously regarded by it, the lessee agreeing to make the plant equal to taking care of them, and spending $500,000 to this end. The phosphate company, though controlled by its lessee, did not disappear, but remained organized, having its own money and property, ready to respond to its own contracts, and in fact doing so in its own name under the operation of the lease, which resulted in an improvement of its own financial condition and the accumulation of a large solvent debt against its lessee. Nothing in the lease itself, or in the conduct of the parties to it prior to 1919, seems necessarily to negative these contentions. Under such circumstances, although it be true that the defendant owned and dominated the phosphate company, we do not see any sufficient reason to say that their separate corporate identities should be disregarded, or one corporation held to be the mere agency of the other as respects plaintiff's antecedent contract. 14 C. J. "Corporations," § 3662.

The sensitive point in the case is really not the lease, which did neither the phosphate company nor its creditors any harm, but its getting rid of the low-price contracts with Armour & Co. and others, which had operated to entitle plaintiff to the rebates. These contracts were testified to be unprofitable after the World War, indeed, threatening the bankruptcy of the phosphate company. Most of them were exchanged for cost plus contracts made directly with defendant. Some saving was thus made in these contracts by a bettered price, and a further saving was no doubt contemplated in the effect on the contract of plaintiff. Putting the new contracts in the name of the defendant instead of the phosphate company was probably for this very purpose. But this suit is not against the phosphate company on the theory that in thus substituting the defendant for itself it had used its fully controlled agency or instrumentality so that the deliveries to Armour & Co. and others continued to be the acts of the phosphate company entitling plaintiff to its rebate. Instead, the plaintiff has sued the defendant, which did not even receive the difference in price sought to be recovered. It clearly appears in the present record that this differ-

ence went to the phosphate company, and is among its assets and liable to its debts, and cannot reach the coffers of the defendant as belonging to it until the phosphate company is liquidated and its affairs settled. The count for money had and received fails just here. As regards the special counts founded on the contract, the making of the new contracts with Armour & Co. and others did not in law make the plaintiff's contract with the phosphate company to become one with the defendant, but the phosphate company remained as much bound to perform it, and as capable of performing it, as ever. If the defendant thereby caused the phosphate company wrongfully to breach its contract, that would be a tort, and we have held that not to be the cause of action set up. But we go further and say that, aside from an adoption of it in fact by defendant, we perceive no breach of the plaintiff's contract by the phosphate company in what was done. The plaintiff has held onto its contract, and demanded what is nominated in the bond. This was phosphate rock at a price of $2.80 per ton, subject to rebate only if "the sellers during the life of the contract should sell any phosphate rock followed by deliveries thereof" at lower prices. This agreement had nothing to do with market price, or what others sold at. It was one-sided, in that the price was not to be raised if the seller could get better prices from others. Mere contracts at lower prices were to have no effect, but only deliveries. The long-time cheap contracts with Armour & Co. and others which were having a doubly disastrous operation were not contracts with plaintiff, and had no effect on plaintiff's contract save as the phosphate company from year to year might make deliveries on them. Plaintiff had no right to have the deliveries made. If the phosphate company should simply refuse to perform, or could buy off and completely terminate these cheap contracts, plaintiff could not complain. If it could arrange with some one else to make new contracts as the price of canceling the old ones, plaintiff could not object. Supposing the only purpose of the substitution to be escape from the rebates, the escape, however purchased, is not a fraud on or a wrong to the plaintiff, nor a breach of plaintiff's contract with the phosphate company.

Since, therefore, neither the ownership of the phosphate company's stock by the defendant, nor the identity of their officers, nor the lease of its property, nor the substitution of the low-price contracts, nor all of these things combined entitled the plaintiff as a

matter of law to a recovery against the defendant, there remains for consideration only the question whether defendant had in fact by intention or by estoppel adopted the phosphate company's contract with plaintiff and made it its own, so that on delivering rock to others afterwards at lower prices it owed the rebate as its own obligation. The letters exhibited in count 4, one written just after the lease and one the following year, may indicate a purpose to adopt. In reply it is contended that the writer had no authority to act for defendant in respect to its contracts, and that the letters were written and signed in defendant's name by mistake. It is also argued that the purpose to adopt is negatived in that the very shipments of rock to which these letters referred were made in the name of the phosphate company, that of the hundreds of bills of lading only seven showed defendant as the consignor and they were errors and oversights, and that all the rock was finally billed by the phosphate company and payment was made to it. The testimony of plaintiff's president is pointed to, that at all times plaintiff had looked to the phosphate company for its rock and complained to it in case of delay, issued checks to it, and received refunds from it, and, if any letter about the business was addressed to defendant, it was in error. This also goes far to rebut any contention that plaintiff was so misled to its disadvantage by the conduct of defendant as to create an equitable estoppel. Indeed, it is not easy to see how plaintiff could have refused to take the rock tendered it, or have acted otherwise than it did if it had always known the full facts. The case of Wiggins Ferry Co. v. Ohio Ry. Co., 142 U. S. 396, 12 S. Ct. 188, 35 L. Ed. 1055, is distinguishable in that there the original contractor disappeared entirely from the transaction, thereby releasing the other party if he so elected, and the successor in its own name proceeded to carry out the contract, doing things "which were only consistent with the adoption of the contract" and "only explicable on that theory," and "which led the other party to believe that he had made the contract his own." None of those things clearly appears here. Many of the acts of the defendant were consistent with adoption and explicable on that theory, but not only on that theory, for they were also explicable by and consistent with the theory that it was executing its obligations under the lease. That there was an adoption of the contract by defendant, notwithstanding the provisions of the lease and the form in which the business was transacted, was not a conclusion demanded by the evidence, if indeed authorized by it, and the judge should not have so directed the verdict.

 Each party moved for an instructed verdict. The plaintiff requested specific instructions if its motion should be denied. The defendant phrased its motion thus: "The defendant moves the court for a directed verdict for the reasons hereafter set forth, but reserves the right to go to the jury on anything the court may regard as a disputed question of fact, in case the court refuses to grant the motion, and defendant's motion for a directed verdict is not to be construed or regarded as having placed the case in the court's hands for a decision of the facts." Specific undisputed matters of fact were then pointed out by the motion as controlling. The court denied defendant's motion, and granted that of the plaintiff. Defendant immediately excepted, but presented no further motion or request. If both sides move for an instructed verdict without more, it is to be understood that both request the court to find the facts, and on review the only question is whether the finding made is supported by substantial evidence. Beuttell v. Magone, 157 U. S. 154, 15 S. Ct. 566, 39 L. Ed. 654; Williams v. Vreeland, 250 U. S. 295, 39 S. Ct. 438, 63 L. Ed. 989, 3 A. L. R. 1038. But a motion for an instructed verdict is the only way to make test of the sufficiency of the evidence to support a contrary verdict. It should not, merely because the opposite party also makes such a motion, involve a surrender of the constitutional right to a jury trial of material contested issues of fact. It often happens, as was claimed in this case, that certain indisputable facts entitle the movant to a verdict if the law upon them is as he claims it; but, if the law be otherwise, he may still win if he can sustain his version of the disputed facts. Where, from the nature of the case and the language of the motion or from other proceedings taken, it is apparent that the movant does not intend to request the court to find the disputed facts, such artificial inference ought not to be made, contrary to the truth. Empire State Cattle Co. v. Atchison R. R., 210 U. S. 1, 28 S. Ct. 607, 52 L. Ed. 931, 15 Ann. Cas. 70; Michigan Copper Co. v. Chicago Screw Co. (C. C. A.) 269 F. 502; Fire Association v. Mechlowitz (C. C. A.) 266 F. 323. The present case belongs to the latter category. We do not regard the failure of defendant to request that specific issues be presented to the jury as important. If the defendant had not

waived a jury trial, the court was bound in a law case to submit controverted issues of fact to the jury. Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Hartman Goldsmith & Co. v. Fidelity & Deposit Co. (C. C. A.) 33 F.(2d) 89.

There is a further contention that rebates on deliveries made in 1923 are in no case collectible, because not within the life of the contract. The contract was originally limited to December 31, 1922, but by its terms undelivered tonnage in one year was to be carried forward to the next. By a special agreement of the parties the undelivered tonnage prior to 1921 was carried over to 1923. Nothing was said therein as to the price. We think the fair construction of the agreement is that the time of delivery was to be extended under the contract stipulations as to price; that is, the life of the contract was protracted into 1923.

Because of the erroneous rulings on evidence, and because of the direction of the verdict for the plaintiff, the judgment is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

HUTCHESON, Circuit Judge (concurring).

I agree with Judge SIBLEY that the judgment of the court below was wrong; with Judge FOSTER that there should be an end to this litigation. I do not, however, agree with Judge FOSTER that it should be ended by an affirmance for plaintiff.

Giving every fact in the record every effect in favor of plaintiff possible to it, it seems plain to me that no obligation of any kind has ever sprung in its favor against the defendant, and I think that, but for the fact that the cause was tried below to a jury (Slocum v. New York Life Ins. Co., 228 U. S. 364, 33 S. Ct. 523, 57 L. Ed. 879) judgment should be here rendered for defendant.

Whether, if the facts developed on the retrial had sustained the factual assumptions of the majority opinion on the former appeal, I should have felt bound to accept that opinion as the law of this case, I do not find it necessary to decide, though I find myself in agreement with Judge Walker's dissent, that the facts upon which the majority rested its conclusion that defendant had assumed a liability to plaintiff do not support that conclusion.

The record here does not present the state of facts assumed and given the most impor-

tance in the former opinion, that there was a secret lease, "kept secret for the purpose of compelling appellant to pay more than the market price for phosphates." It directly and by the uncontradicted proof rebuts that assumption, and leaves this court not only at liberty, but bound to determine on this appeal the legal effect of the undisputed facts which this record discloses.

These facts make it entirely clear to me that it never was the purpose of the defendant to assume Phosphates' contract, but quite the contrary, that it took no action having that effect, and that a verdict finding that way on this record would be without a shred of evidence to support it.

If a cause of action could arise out of the act of the defendant in arranging for the cancellation of the low price contracts with Armour & Co. and others, for the purpose and with the effect of removing the conditions which gave plaintiff the right to rebates, plaintiff should of course have had an instructed verdict, for there is no question but that the defendant did just that thing.

If that action alone could not furnish the spring of liability, and it is perfectly clear to me that it could not, then defendant should have had an instruction, for that was all that the defendant did. To find in the face of the deliberately adopted and carefully carried out purpose of defendant not to assume or become liable for plaintiff's contract with Phosphate that it did do so, would be to permit a theory that it ought to have done so to supply the place of evidence that it did.

I concur in the judgment of reversal, but, believing with Judge FOSTER that this litigation over an undisputed state of facts ought to end, I think that, instead of a general reversal, the reversal ought to be with directions to instruct a verdict for defendant, if upon a retrial the same facts appear.

FOSTER, Circuit Judge (dissenting).

This is the second appeal in this case. On the former appeal we reversed a judgment based on a verdict directed for defendant at the close of the plaintiff's evidence. Our former decision is conclusive on the question that there was sufficient evidence before the court to support plaintiff's cause of action. The same evidence is in the record on this appeal. While there are some ninety-four assignments of error running to rulings on the admission or exclusion of evidence, only fourteen of them are in form suf-

ficient to properly present them in this court. These assignments in my opinion are immaterial, as the evidence admitted or rejected would not substantially affect the rights of the defendant.

The record shows that at the close of all the evidence both plaintiff and defendant moved for a directed verdict. The rule is well settled that in that situation both sides assert that there is no disputed question of fact to be submitted to the jury. If there is any evidence at all to support the judgment, it cannot be disturbed on appeal. The exception to the rule is this: Where a party in asking for a directed verdict submits requests for special instructions to the jury, he asserts that, while he believes there is undisputed evidence in the record warranting a judgment in his favor, there is also disputed evidence which, if the conflict is resolved in his favor, would entitle him to a verdict. In this case the plaintiff submitted requests for special instructions, but the defendant did not. The defendant incorporated with its motion to direct a lengthy argument in support thereof, but nowhere does it appear that the defendant asked for special instructions. The part of this motion quoted in the majority opinion amounts to nothing unless it be to create a trap for the trial judge, which ought not to be tolerated. If the defendant had any idea that disputed evidence in the record entitled it to a verdict, if the conflict were resolved in its favor, it was its duty to point it out clearly to the court. The defendant can derive no benefit from the action of the plaintiff, and its motion should be governed by the general rule. Beuttell v. Magone, 157 U. S. 154, 15 S. Ct. 566, 39 L. Ed. 654; Empire State Cattle Co. v. Atchison, Topeka & Santa Fé Ry. Co., 210 U. S. 1, 28 S. Ct. 607, 52 L. Ed. 931, 15 Ann. Cas. 70; Sena v. American Turquoise Co., 220 U. S. 497, 31 S. Ct. 488, 55 L. Ed. 559; Williams v. Vreeland, 250 U. S. 295, 39 S. Ct. 438, 63 L. Ed. 989, 3 A. L. R. 1038; Birge-Forbes Co. v. Heye, 251 U. S. 317, 40 S. Ct. 160, 64 L. Ed. 286.

In my opinion there is sufficient evidence in the record to support the conclusion that the phosphate company had become the mere alter ego of the cyanamid company, and that the latter had in fact assumed the contract between the phosphate company and plaintiff (appellee).

I have no doubt that, had the case been submitted to the jury upon proper instructions, the result would have been the same. However, it is not our province to weigh and reconcile the evidence. There is ample evidence to sustain the conclusion reached by the District Court, and we have no right to substitute our opinion for his. There should be an end to this litigation, and the judgment should be affirmed. For these reasons I respectfully dissent.