CARLTON, J.,
dissenting:
¶ 74. I dissent from the majority’s opinion. I would affirm the judgment of the trial court. I respectfully submit that the majority errs in reversing and rendering in favor of Riverboat-Vicksburg and errs in dismissing Isle of Capri with prejudice. I find no error in the trial court’s determination that the parent corporation, Isle of Capri, and its subsidiary, Riverboat-Vicksburg, possessed liability in this case for the breach of the contractual obligations regarding ATM services with Silver Land.
¶ 75. I respectfully submit that the record reflects sufficient evidence that the corporate veil was pierced since Isle of Capri and Riverboat-Vicksburg operated as alter egos in acting as mere instrumen-talities of the other’s economic benefit.[3] *606 The trial court’s finding of contractual breach is not erroneous and is consistent with the evidence in the record. The record reflects that Isle of Capri entered into an express written 2001 ATM Agreement as a signatory with Silver Land, agreeing to the performance of certain contractual obligations by it and certain subsidiaries, including Riverboat-Vicksburg. In so doing, Isle of Capri disregarded corporate formalities with subsidiaries, subject to that agreement, in acting as instrumentalities of the other for economic benefit.[4] After entering into this ATM Agreement, the record shows that Isle of Capri and Riverboat-Vicksburg then operated and benefitted under that 2001 ATM Agreement until the sale to Legends by Isle of Capri (the parent corporation) in 2006. The record shows that Silver Land relied on the 2001 ATM Agreement and obligations agreed to therein and that Silver Land performed its obligations under that agreement until 2006, when told to remove its machines prior to expiration of the 2001 ATM Agreement.
¶ 76. The actions of Isle of Capri and Riverboat-Vicksburg pierced the corporate veil in acting as a single economic unit or alter egos of each other in this ATM Agreement with Silver Land. Both Riverboat-Vicksburg and Isle of Capri are therefore now equitably estopped from denying and attempting to avoid liability by asserting the very corporate formalities that Isle of Capri disregarded when entering, and later operating under, the 2001 ATM agreement. See Corrigan v. U.S. Steel Corp., 478 F.3d 718, 724 (6th Cir.2007) (court will pierce corporate veil where parent corporation holds itself out as liable for certain subsidiary obligations). Where evidence shows that a corporation operates as the alter ego of another corporation, then courts will pierce the corporate veil, when to do otherwise would result an injustice or unfairness due to abuse of the legislatively established corporate formalities. See Beco Inc. v. Am. Fid. Fire Ins. Co., 370 So.2d 1343, 1346 (Miss.1979); see also FMC Fin. Corp., 632 F.2d at 421-22) (corporate-disregard doctrine is an equitable doctrine, must be applied on a case-by-case basis, and requires flexibility). Precedent prohibits the disregarding by corporations of corporate formalities between parent and subsidiary corporations in contractual relations with third parties when such corporations later attempt to shield themselves from liability by raising the previously disregarded formalities. See generally Gen. Motors Acceptance Corp. v. Bates, 954 F.2d 1081, 1084-86 (5th Cir.1992) (sufficient evidence presented showing corporate veil of auto dealer pierced where corporate formalities ignored); see also A & L Inc. v. Grantham, 747 So.2d 832, 839 (¶¶ 20-22) (Miss.1999) (husband’s interests in corporations and property owned by corporation commingled such that they became marital assets, and corporation merely an alter ego); Thames & Co. v. Eicher, 373 So.2d 1033, 1035 (Miss.1979) (corporation shown to be no more than alter ego).
¶ 77. As stated, a review of the record reflects that Isle of Capri breached its own express written contract agreement with Silver Land, the 2001 ATM Agreement, *607 wherein Isle of Capri granted Silver Land the exclusive rights to provide ATM services in hotel and theater pavilions at Tu-nica and Vicksburg, in addition to the rights already possessed by Silver Land to provide such services on all vessels at all casino locations in Mississippi.[5] Isle of Capri thereafter failed to convey, assign, or sell the 2001 ATM Agreement to Legends in 2006 at its own peril, and Riverboat-Vicksburg’s peril, since the 2001 ATM Agreement had not expired or terminated under the terms of that ATM Agreement.[6] The termination provision included in the terms of the 2001 ATM Agreement defined when that 2001 ATM Agreement would terminate, and that 2001 agreement did not provide for termination upon a sale of Riverb oat-Vicksburg or any of the other subsidiaries subject to the 2001 ATM Agreement. See Zumwalt v. Jones Cnty. Bd. of Supervisors, 19 So.3d 672, 685 (¶ 58) (Miss.2009); U.S. Fid. & Guar. Co. of Miss. v. Martin, 998 So.2d 956, 963 (¶ 13) (Miss.2008) (finding that clear and unambiguous contracts will be enforced).
¶78. With respect to the 2001 ATM Agreement and privity of contract, Isle of Capri, a Delaware corporation, and Silver Land, a Mississippi corporation, constituted the signatory parties to the October 31, 2001 ATM Agreement. The plain language and face of the ATM Agreement shows that Isle of Capri errs in asserting that the only parties to the 2001 agreement are Silver Land and Lady Luck. No veil needs be pierced to reach Isle of Capri, since Isle of Capri expressly agreed to be bound in the 2001 ATM Agreement. Additionally, the text of the 2001 ATM Agreement provides that Isle of Capri also entered into the agreement on behalf of its subsidiaries, including Riverboat-Vicksburg.[7] However, Isle of Capri enjoyed the benefits of preexisting agreements that provided for ATM services to be provided by Silver Land, even before Isle of Capri expressly contracted with Silver Land in 2001 for ATM services, since Isle of Capri acquired Lady Luck in 1999.
¶ 79. With respect to scope of the 2001 ATM Agreement, the text explains that Isle of Capri previously acquired Lady Luck, a Mississippi corporation, and its subsidiaries. In the 2001 ATM Agreement, Isle of Capri granted Silver Land exclusive rights to provide ATM services in hotel and theater pavilions at Tunica and Vicksburg and the rights that Silver Land already possessed at that time to provide such services on all vessels at all casino locations in Mississippi.[8] This 2001 *608 ATM Agreement further provided in paragraph seven that in the event that Isle of Capri acquired new locations in Mississippi, then such locations shall become subject to the terms of the 2001 ATM Agreement. The Isle of Capri asserts that it failed to even be in the picture until 1999 when it acquired Lady Luck, and Isle of Capri disavows any privity of contract with the 1992 lease agreement or its amendments. Such an argument overlooks the written, not oral or inferred, ATM Agreement agreed to by Isle of Capri as signatory in 2001, obligating Isle of Capri and its subsidiaries included therein.[9] The record shows that in the ATM Agreement and in subsequent operations, Isle of Capri treated the subsidiaries subject to that agreement as though they were united with the Isle of Capri as one economic unit — or its alter egos. A parent corporation that disregards corporate formalities and that expressly agrees in writing to be bound for the debts or contracts of a subsidiary is thereby bound by that agreement. See Corrigan, 478 F.3d at 724.
¶ 80. Admittedly the record shows that when the parent corporation, Isle of Capri, acquired Lady Luck in 1999 via merger of another one of Isle’s subsidiaries, no privity of contract existed at that time between Isle of Capri and Silver Land, but Isle of Capri enjoyed the benefits of the preexisting contracts. Then, Isle of Capri gained privity of contract with Silver Land upon signing the 2001 ATM Agreement, and, as stated, Isle of Capri in that agreement and subsequent operations acted as an alter ego of its subsidiaries with respect to this contract. In the 2001 ATM Agreement, Isle of Capri clearly grants rights to Silver Land to provide the disputed ATM services to certain Mississippi subsidiaries and locations within Mississippi, including the Riverboat-Vicksburg, and the 2001 agreement terms incorporate by reference the primary terms of the 1992 lease to define when the ATM Agreement expired or terminated. Since Isle of Capri constituted a signatory to this express 2001 agreement, by this conduct, Isle of Capri expressed its intention to be bound for the performance of its subsidiaries pursuant to the terms of the 2001 ATM Agreement.[10] See Corrigan, 478 F.3d at 724 (court will pierce corporate veil where party held itself out as liable for certain subsidiary obligations); see also 38 A.L.R.3d 1102 § 13 (1971) (discussing liability of parent corporation for contracts of subsidiaries when they guarantee debts or obligations of subsidiary).
¶ 81. The 2001 ATM Agreement defines when it terminates in its own provisions. Isle of Capri expressly agreed to the 2001 ATM Agreement as a signatory and entered into that agreement on behalf of certain subsidiaries, including Riverboat-Vicksburg, and their subsequent actions further show that the parent and subsidiary corporations acted as mere instrumen-talities of each other with respect to performance and operation under this 2001 contract. So, the terms of that 2001 ATM Agreement determine when the obligations thereunder of Isle of Capri and the includ *609 ed subsidiaries terminate. Paragraph ten of the 2001 ATM Agreement sets forth the termination provisions of the ATM Agreement, providing that the agreement will terminate in one of two ways: (1) upon the date that the primary terms of the lease expired;[11] or (2) upon the failure of Silver Land to perform its duties under the contract to provide the agreed-upon ATM services after appropriate notice of such. However, the ATM Agreement includes no term allowing for termination in the event that Isle of Capri sold Lady Luck, or upon the sale of any of Isle of Capri’s other Mississippi subsidiaries.[12] As acknowledged, the ATM Agreement states that termination would occur upon nonperformance of Silver Land or upon the date that the primary terms of the lease expired. A review of the Natchez lease, referenced by the 2001 ATM Agreement to define the length/term of the ATM Agreement, shows that the primary terms of the lease spanned forty years from the rent commencement date. The rent commencement date was defined in the addendum to the lease as when gaming commenced by Lady Luck on July 16,1993.[13]
¶ 82. In applying the terms of the termination provision of the 2001 ATM Agreement, Isle of Capri agreed to be bound to that agreement until one of the two stated termination events occurred. Here, neither of the termination events set forth in the 2001 ATM Agreement occurred, and therefore Isle of Capri remained bound to the terms granting Silver Land the exclusive right to provide ATM services to Riverboat-Vicksburg since the agreement granted Silver Land exclusive rights to such at all of its Mississippi locations and vessels. Riverboat-Vicksburg also remained bound due to the pierced corporate veil of its parent. The rupture of the pierced veil is displayed in the disregard of corporate formalities by Isle of Capri in entering into the contract ensuring the performance of Riverboat-Vicksburg along with other subsidiaries and also in the actions of Isle of Capri and Riverboat-Vicksburg in subsequent performance, management, and receipt of a benefit under the agreement until 2006.[14] Isle of Capri gave Silver Land (UMB) the right to provide ATM services to Isle of Capri and certain subsidiaries, and the record shows that until July 2006, Silver Land provided those ATM services to Isle of Capri, including the Vicksburg casino, or Riverboat>-Vicksburg. As acknowledged, the 2001 ATM Agreement signed by Isle of Capri contains no provision that terminates the agreement upon the subsequent sale of Riverboat-Vicksburg or any of the *610 other subsidiaries identified in that 2001 agreement. Therefore, Isle of Capri and its subsidiary Riverboat-Vicksburg remained bound to the terms of the 2001 ATM Agreement until that agreement terminated under its own terms.
¶ 83. The purchase agreement with Legends specifically excluded the 2001 ATM Agreement from the sale. The purchase agreement between Legends and Isle of Capri, dated February 13, 2006, included as parties to the purchase agreement the subsidiaries subject to the purchase: Louisiana limited-liability companies, Mississippi limited-liability companies, and Mississippi corporations, including Riverboat-Vicksburg. In this purchase agreement, Isle of Capri at its own peril failed to assign, convey, or sell to Legends the preexisting 2001 ATM Agreement since the 2001 agreement had not terminated or expired under its termination provisions. However, the purchase agreement clearly excluded the 2001 ATM Agreement. Specifically, paragraphs 2.02, 2.03(b), and 2.03(1) of the purchase agreement with Legends, as well as the purchase agreement’s attached 2.03(b) disclosure statement, show that Legends excluded any interest or rights in the 2001 ATM Agreement, while also acknowledging its existence.
¶ 84. In the purchase agreement with Legends, the section 2.03(b) disclosure statement, entitled “Section 2.03(b) Other Retained Assets,” identifies contracts and assets retained by Isle of Capri and/or its subsidiaries and not conveyed, sold, or assigned to Legends in the purchase agreement. Item number five on that disclosure list of “Other Assets Retained” specifically identifies the ATM Agreement dated October 31, 2001, between Silver Land and Isle of Capri. Clearly the 2001 ATM Agreement was not conveyed or assigned to Legends, but Isle of Capri, a signatory and party to the ATM Agreement, nonetheless remained obligated under the prior agreement since no expiration of the primary terms of the lease had yet occurred and no notice of any nonperformance of the agreed services under the ATM agreement had been provided by Silver Land.
¶ 85. As discussed, the 2001 ATM Agreement included no provision that would provide for termination upon the sale of subsidiaries by Isle of Capri. The 2006 purchase agreement identified the 2001 ATM Agreement as an Isle of Capri contract that Legends excluded from the purchase and as a contract that Isle of Capri retained. Additionally, the record reflects that Johnny Christianson, the CEO of UMB, got a letter in 2006, years prior to the expiration of the primary terms of the forty-year lease, requesting him to remove the ATMs from the boat, and he complied with the requested removal. Silver Land presented sufficient evidence, including expert testimony, in support of its claim for damages,[15] and I would affirm both the trial court’s grant of summary judgment and the judgment for damages as awarded by the jury.
¶ 86. Based on the foregoing, I dissent.
LEE, C.J., JOINS THIS OPINION. IRVING, P.J., JOINS THIS OPINION IN PART.

. See Rest. of Hattiesburg, LLC v. Hotel & Rest. Supply, 84 So.3d 32, 38-9 (¶¶ 20-21) (Miss.Ct.App.2012) (acknowledging that courts will pierce corporate veil where a corporation is in fact an alter ego; recognizing Mississippi applies factors set forth in Gray v. Edgewater Landing, Inc., 541 So.2d 1044, 1047 (Miss. 1989); Liberty Mut. Ins. Co. v. Holliman, 765 So.2d 564, 570 (¶ 15) (Miss.Ct.App.2000) (veil pierced where two corporations were alter egos of the other); see also Tanfield Eng’g Sys., Inc. v. Thornton, 97 So.3d 694, 698-99 (¶¶ 13-15) (Miss.2012) (discussing piercing the corporate veil; explaining that Mississippi *606 Supreme Court had not adopted the ten factors used by federal courts as set forth in Gammill v. Lincoln Life & Annuity Distributors, 200 F.Supp.2d 632, 634-35 (S.D.Miss.2001), but stating that the ten factors were instructive regarding the alter-ego theory of liability).

. See Liberty Mut., 765 So.2d at 570 (fl 15) (finding that corporate veil was pierced where two corporations were alter egos of each other); see also FMC Finance Corp. v. Murphree, 632 F.2d 413, 421-22 (5th Cir.1980) (discussing corporate-disregard doctrine).

. In this 2001 ATM Agreement, the parent corporation, Isle of Capri, entered into this agreement to perform the contractual obligations, and also to be bound thereto, on behalf of its subsidiaries covered by the agreement, including Riverboat-Vicksburg. Isle of Capri and the subsidiaries subject to the 2001 ATM agreement performed under this agreement and enjoyed the benefits of such until the sale to Legends.

. Isle of Capri sold certain subsidiaries, including Riverboat-Vicksburg to Legends in 2006. In that purchase agreement, certain contracts supporting ongoing operations were assigned or conveyed to Legends in the sale. However, the purchase agreement reflects that this ATM contract with Silver Land was specifically excluded from the sale to Legends despite the fact that the 2001 ATM Agreement had not terminated.

. See Am. Cyanamid Co. v. Wilson & Toomer Fertilizer Co., 51 F.2d 665, 670 (5th Cir.1931) (finding the parent corporation not liable ipso facto for a contract of its subsidiary).

. Isle of Capri granted Silver Land the exclusive rights to provide ATM services in Tunica and Vicksburg, and the 2001 agreement stated that this was in addition to the rights already possessed by Silver Land. The preexisting rights were conveyed to Silver Land by the 1992 lease with Lady Luck and its subsequent addendum and 1998 amendment. See also 3 Jeffrey Jackson & Mary Miller, Ency *608 clopedia of Mississippi Law § 22:204, at 467 (2001) (stating that unless the parent corporation dissolves the subsidiary or commits acts causing the separate entity to be disregarded, any liabilities of a subsidiary remain with it). In this case, Isle of Capri voluntarily entered into an agreement in 2001 with Silver Land, granting it exclusive rights to provide ATM services to its Mississippi subsidiaries.

. As stated, Isle of Capri entered this express 2001 ATM agreement after the 1999 merger wherein it acquired Lady Luck.

. These subsidiaries so bound included Riverboat-Vicksburg.

. The termination provision of the 2001 ATM Agreement refers to the 1992 lease that defined the primary terms of the 1992 lease. This lease was amended in 1998, and Isle of Capri acquired Lady Luck in 1999 by merger of an Isle of Capri subsidiary into Lady Luck. After that merger, Isle of Capri entered into the 2001 ATM Agreement with Silver Land resulting in privity of contract between Silver Land and the parent corporation, Isle of Capri. Privity of contract also remained between Silver Land and Lady Luck after Isle of Capri's subsidiary merged into Lady Luck upon the acquisition of Lady Luck.

. See Miss.Code Ann. § 79-13-906 (Rev. 2009) (effect of merger); see generally Miss. Code Ann. § 79-29-211 (Supp.2012); Miss. Code Ann. § 79-29-213 (Supp.2012).

. See Acordia of Ohio, L.L.C. v. Fishel, 133 Ohio St.3d 356, 978 N.E.2d 823, 828 (¶ 17) (Ohio 2012) ("[A] properly executed contract is binding on the surviving entity in a merger unless the agreement explicitly sets forth that in the event of a merger, the obligations of the constituent corporation cease to exist.”).

. See Forsythe v. Clark USA, Inc., 224 Ill.2d 274, 309 Ill.Dec. 361, 864 N.E.2d 227, 241-42 (2007) (discussing piercing the corporate veil due to direct participant liability).

. At trial, defense counsel argued that the jury should award Silver Land $500,000 to discount the uncertainty of the $2,275,000 in damages requested by the plaintiff.